**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **Marcus F.**, **Garrett M.**, a minor, by his next friend Jared Trujillo, **Isaac R.**, a minor, by his next friend Ms. Y., and **Christopher M.**, on behalf of themselves and all other similarly situated youth, | **CLASS ACTION COMPLAINT** |

                    Plaintiffs,

        -against-

**DaMia Harris-Madden**, in her official capacity as Commissioner of the New York State Office of Children and Family Services, and **Norman Hall**, in his official capacity as Deputy Commissioner, Division of Juvenile Justice and Opportunities for Youth,

                    Defendants.

---

## INTRODUCTION

1.      This class action civil rights lawsuit challenges the New York State Office of Children and Family Services's ("OCFS") unlawful policy and practice of routinely locking youth in its care in solitary confinement for weeks and sometimes months on end.

2.      OCFS routinely and unlawfully imposes solitary confinement in its five secure placement facilities,[1] locking youth as young as 12 years old alone in small, barren cells[2] for extended periods with no recourse to secure their release.

---

[1] OCFS's five secure placement facilities are intended to serve as rehabilitative and treatment facilities where youth are placed after they are found to have committed an offense in New York's family courts or criminal court youth parts and sentenced to a term of incarceration.

[2] Although OCFS regulations refer to "rooms," they are functionally indistinguishable from cells.

3.    OCFS regularly subjects youth to near-total, around-the-clock isolation; deprives them of education, programming, and mental stimulation; only permits "recreation" alone in empty gyms; provides unreliable access to drinking water; and imposes toilet restrictions so severe that youth are often forced to defecate and urinate in buckets and bottles in their cells.

4.    Decades of scientific research confirm that even short periods of solitary confinement are dangerous for youth, inflicting enduring harm and profoundly increasing their risk of mental illness and suicide.  Recognizing these risks, mental health organizations and correctional associations alike have called for an end to this practice.

5.    New York State itself banned the use of solitary confinement on youth and young adults in adult facilities when it enacted the Humane Alternatives to Long-Term Solitary Confinement Act in 2021.[3]

6.    The federal government likewise prohibits solitary confinement of youth in the federal prison system.  A U.S. Department of Justice ("DOJ") report found that "[n]owhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement."

7.    Despite this widespread consensus about the serious and lasting harm of solitary confinement, OCFS continues to impose this dangerous practice on youth in its care.

8.    OCFS imposes solitary confinement as punishment for alleged rule infractions and, at times, minor misbehavior, including manifestations of youth's disabilities.

9.    OCFS also imposes solitary confinement as a way of operating its facilities with dangerously low staffing levels.

---

[3] Humane Alternatives to Long-Term Solitary Confinement (HALT) Act, Ch. 93, 2021 N.Y. Laws 93.

10.     OCFS subjects youth to solitary confinement at times in violation of its own regulations and policies, which themselves use misleading, innocuous names for what in practice is solitary confinement, including group confinement, special programs, room confinement, or modified programming.

11.     Whatever the ostensible reason or label, the result for youth subjected to solitary confinement is always the same: extreme deprivation of social contact, education, programming, communal recreation, reliable access to water, and reliable access to toilets.

12.     For youth in OCFS custody, many of whom have mental illness, the negative consequences of this isolation are predictably profound.  Youth subjected to solitary confinement become anxious and suffer from depressive symptoms, post-traumatic stress, emotional dysregulation, and worsening behavior.  Some have expressed suicidal thoughts or intent, unable to cope with the isolation and seeing no end in sight.

13.     Named Plaintiffs are four youth who are currently held in secure placement facilities, where OCFS, acting pursuant to policy and practice, routinely imposes solitary confinement. Plaintiffs bring this action on behalf of themselves and hundreds of similarly situated youth across New York, who will continue to endure the profound harms of isolation for as long as OCFS's unlawful policies and practices continue unabated.

14.     OCFS has violated and continues to violate Plaintiffs' rights under the Eighth and Fourteenth Amendments to the U.S. Constitution and the Americans with Disabilities Act ("ADA"). The Plaintiffs seek declaratory and injunctive relief to end OCFS's cruel and discriminatory use of solitary confinement once and for all.

# PARTIES

**Plaintiffs**

15.    Plaintiffs are all youth who are or will be held in an OCFS secure placement facility.

16.    Youth in OCFS secure placement facilities are predominately male and Black or Latinx. As of December 2024, 95% of youth in OCFS secure placement were male.  Even though only 16% of the youth population in New York State is Black, 63% of youth in secure placement are Black and 28% are Latinx.

17.    In addition, over half of youth in New York's juvenile justice system, including in secure placement, have mental illness.

18.    While OCFS does not appear to track relevant data, the majority of youth in other areas of New York's juvenile justice system have diagnosed disabilities and are performing grossly below grade level in reading proficiency.

19.    Named Plaintiff Marcus F.[4] is a Black, 18-year-old young person who was born in the Bronx and raised in New York City.  He is currently in OCFS custody at MacCormick Secure Center, a secure placement facility.  Before being placed at MacCormick, Marcus was placed at Brookwood Secure Center for Youth.  At these facilities, OCFS has subjected and continues to subject Marcus to solitary confinement.  Marcus is an individual with a disability as defined by the ADA.

20.    Named Plaintiff Garrett M. is a Black, 16-year-old boy born and raised in New York City.  Garrett is currently in OCFS custody at Industry Residential Center, where he resides on the

---

[4] Because two Named Plaintiffs in this litigation are minors under the age of 18, Federal Rule of Civil Procedure 5.2(a) requires them to file anonymously.  Additionally, because minor plaintiff Isaac R. is proceeding through a parent as next friend, his parent is also required to file anonymously.  *S.F. v. Archer Daniels Midland Co.*, 594 F. App'x 11, 12 n.1 (2d Cir. 2014).  Although the rule states that minors may proceed by initials, courts have liberally permitted the use of pseudonym as well.  *See, e.g., Elisa W. v. City of New York*, No. 1:15-cv-05273-LTS-HBP (S.D.N.Y. May 22, 2025).  The other two Named Plaintiffs, who are just over the age of 18, have filed a separate motion requesting leave to proceed anonymously.

Secure Upper Campus.  OCFS has subjected and continues to subject Garrett to solitary confinement.  Garrett appears through his next friend, Jared Trujillo.  Mr. Trujillo is familiar with Garrett's background and the conditions of his confinement and is dedicated to Garrett's best interests.  Garrett is an individual with a disability as defined by the ADA.

21.    Named Plaintiff Christopher M. is a Black, 20-year-old young person from Harlem, New York.  Christopher is currently in OCFS custody at Goshen Secure Center.  OCFS has and continues to subject Christopher to solitary confinement.  Christopher is an individual with a disability as defined by the ADA.

22.    Named Plaintiff Isaac R. is a 17-year-old Black boy born and raised in New York City.  Isaac is currently in OCFS custody at Goshen Secure Center.  OCFS has and continues to subject him to solitary confinement.  Isaac appears through his next friend and mother, Ms. Y.  Isaac is an individual with a disability as defined by the ADA.

**Defendants**

23.    Defendant DaMia Harris-Madden is the Commissioner of OCFS and is sued in her official capacity.  OCFS is the executive agency directly responsible for programs involving juvenile justice in New York State, including the operation of five secure placement facilities.  OCFS is also a public entity under Title II of the ADA.

24.    As Commissioner, Defendant Harris-Madden is responsible for the administration, regulation, and supervision of the juvenile justice system.  Defendant Harris-Madden has final policymaking authority for secure placement facilities and is personally involved in authorizing and maintaining the unlawful policies and practices challenged by Plaintiffs.

25.    Defendant Norman Hall is the Deputy Commissioner of OCFS's Division of Juvenile Justice and Opportunities for Youth and is sued in his official capacity.  Defendant Hall oversees

and supervises New York State's juvenile justice system, including secure placement facilities, and is personally involved in authorizing and maintaining the unlawful policies and practices challenged by Plaintiffs.

26.    At all times relevant to the allegations in this complaint, Defendants were acting under color of state law.

## JURISDICTION AND VENUE

27.    This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983 and the ADA, 42 U.S.C. § 12101 *et seq.*  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

28.    This Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, its inherent equitable powers, and Rule 65 of the Federal Rules of Civil Procedure.  This Court has authority to award costs and attorneys' fees under 42 U.S.C. §§ 1988 and 12205.

29.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this district.  Additionally, OCFS has offices and a secure placement facility in this district.

## FACTUAL ALLEGATIONS

**A.  OCFS Unlawfully Uses Solitary Confinement in its Secure Placement Facilities**

*1.  OCFS Secure Placement Facilities*

30.    OCFS is New York State's child welfare and juvenile justice agency.  Its mission is to "promot[e] the safety, permanency and well-being of our children" through its "policies . . . partnerships . . . and [] quality services."  OCFS's stated purpose involves "promoting [youth] development" and "protecting [youth] from violence, neglect, abuse and abandonment."

31.    Located throughout New York State, OCFS secure placement facilities hold youth ages 12 to 21 who have been adjudicated or convicted of a criminal offense and placed in or committed to the care and custody of OCFS.  These facilities are intended to "recognize[] the unique needs of young people who are still developing mentally, emotionally, and physically, and as such, have great potential for positively transforming their lives with proper rehabilitative support in a safe and secure environment."  9 NYCRR § 7401.1.

32.    Defendants oversee each facility and are responsible for both the day-to-day operation of and the policies and practices governing the facilities.

33.    OCFS operates five secure placement facilities: Brookwood Secure Center for Youth, Goshen Secure Center, MacCormick Secure Center, Industry Residential Center, and Harriet Tubman Residential Center.

34.    Brookwood Secure Center for Youth ("Brookwood") is a 125-bed secure placement facility located in Claverack, New York.  Brookwood has 11 living units in each of which eight to 14 youth reside while held at the facility.

35.    Goshen Secure Center ("Goshen") is an 85-bed secure placement facility located in Goshen, New York.  Goshen has four areas with several living units to hold youth.

36.    MacCormick Secure Center ("MacCormick") is a 48-bed secure placement facility located in Brooktondale, New York.  MacCormick has three units to hold youth.

37.    Industry Residential Center ("Industry"), located in Rush, New York, has two campuses housing youth.  The Upper Campus operates as a secure placement facility with 80 beds.

38.    Harriet Tubman Residential Center ("Tubman"), located in Auburn, New York, is a campus whose main building has two living units for girls and young women.  Tubman operates as both a secure and limited secure placement facility.[5]

39.    At each secure placement facility, youth are held on units with multiple cells and a common area with shared bathroom facilities.

40.    OCFS is mandated to supervise the youth in its care.  This supervision includes supervisory visits at least every 30 minutes and the continuous placement of staff on the units.  9 NYCRR § 7404.2.

41.    OCFS is also mandated by law to provide youth treatment and rehabilitation at its secure placement facilities, and there are extensive regulations mandating the provision of various services to youth in OCFS custody.  N.Y. EXEC. LAW § 504; see, e.g., 9 NYCRR §§ 7416 (education); 7418.2 (recreation); 7422.3 (visitation); 7415.6 (counseling).

42.    Youth are intended to have free access to the common area and be permitted to enter and exit their cell during daytime hours.  Much of that time is supposed to be used for education, recreation, programming, counseling, meals, showers, socializing with other youth on the unit, and calls to or visitation with parents and family.

43.    OCFS is required to provide at least five and a half hours per day of educational instruction "that is appropriate for each resident's age, educational needs, and interests," as well as other General Educational Development ("GED") classes, vocational training, and college courses for those eligible.  OCFS Policy and Procedures Manual ("PPM") 3273.06, 3273.08.

44.    OCFS is also required to provide two to three hours per day of "structured recreational and leisure-time activities" designed to "promote physical, emotional, and social development of

---

[5] Both Industry and Tubman operate as both a secure and limited secure placement facility.  The allegations herein concern the secure placement units at each facility.

youth." PPM 3274.00. Forty-five minutes of this time must be outside. 9 NYCRR §§ 7418.1, 7418.2; PPM 3274.00.

45.    OCFS is required to allot youth a minimum of two and a maximum of four hours per day for outgoing phone usage. PPM 3423.00. Facilities are also required to provide for two hours of visitation per week. 9 NYCRR § 7422.3.

46.    OCFS is required to provide formal counseling services to youth, which may include a combination of individual and group sessions, for not less than three hours per week. PPM 3270.00.

47.    When a youth enters OCFS custody, the secure placement facility must request and review the youth's records, including education records, medical records, and mental health records. PPM 3401.00; 3402.01.

48.    OCFS must also perform several medical and mental health evaluations and screenings to assess the status of the youth. PPM 3243.18; 3243.33. Because youth entering OCFS custody "often have a history of physical health challenges and are far more likely to have mental health problems . . . [it] is important to ensure they are receiving required physical and mental health assessments in a timely manner." Yet, OCFS fails to ensure timely medical and mental health screenings when a youth enters its custody.

### 2. OCFS Regularly Subjects Youth to Solitary Confinement

49.    Solitary confinement is the involuntary isolation of youth in a locked cell, room, or other area.

50.    OCFS regularly subjects youth in its secure placement facilities to solitary confinement, isolating youth in cells for up to 24 hours a day, in some cases, for periods of weeks and even months.

51.    While OCFS's solitary confinement of youth can vary in duration, the conditions it imposes are the same.  Typical cells at these facilities are small and stark and contain a single mattress and table.  Some cells have windows; others do not.  The floors are concrete, and the walls are barren.  A unit at Brookwood that is used for solitary confinement, referred to as "Wing 11," is marked by a sign reading "The Morgue," reflecting the punitive and degrading culture of the unit.



A picture of a cell at Industry Residential Center, taken on June 9, 2025.

52.    Nearly every aspect of solitary confinement is dehumanizing.  Many cells are filthy with fecal matter and old food, not cleaned between occupants.  Many cells have also fallen into disrepair, with vents and sockets partially dislodged, holes or carvings in the walls, or flooring ripped up.  The solitary confinement cells in Wing 11 at Brookwood lack working radiators, leaving residents without adequate heat in the winter.

53.    The typical cell door is solid with one plexiglass window.  In some cells, that window is obstructed so the youth cannot see out, and staff cannot adequately see inside.  Other cells have no windows, and the doors are only equipped with a slot for food to slide in and out.  The cells have no telephones, radios, or televisions, and youth are restricted in what personal property they can have.

54.    Almost none of the cells in which youth are routinely held have toilets or sinks.  As a result, youth must ask to be released from their cells to use the bathroom or be forced to use garbage pails, water bottles, food containers, or buckets to relieve themselves.  The smell of urine and feces can permeate these units.

55.    OCFS staff are often absent from the units for hours at a time, leaving youth locked in their cells without supervision or access to basic necessities.  As a result, youth are forced to bang on their doors or yell to get staff attention in order to use the bathroom, get water, or seek help.

### 3. OCFS Deprives Youth of Meaningful Social Interactions, Programming, and Education as Punishment or For Facility Management Purposes

56.    OCFS uses solitary confinement as a means of punishment and as a means of operating its facilities with dangerously low staffing levels.

57.    Youth are regularly placed in isolation as a result of alleged misbehavior that reflects normal adolescent behavior or is a manifestation of their disabilities.  In response to such incidents, many youth are confined to their cells for up to 23 hours a day for weeks or even longer.

58.    During this time, youth are allowed out of their cells for only one, or sometimes two, one-hour period per day to shower, use the bathroom, or make a phone call.  If afforded a second hour out of their cell, youth are provided with so-called "recreation," which often consists of a youth being brought alone to an empty gym.  Youth are not given the opportunity to interact with their peers.

59.    Even this limited out-of-cell time is not consistently provided and is often denied due to staffing shortages or as a punishment for alleged rule infractions or minor misbehavior.  As a result, some youth are held in 24-hour isolation.

60.    Youth are also subjected to solitary confinement in response to OCFS's failure to maintain proper staffing.  At times, entire units are placed in solitary confinement for days or even months, with conditions ranging from brief out-of-cell time in small groups of two or three for limited recreation and bathroom use up to three times per day, to "one-in-one-out" practices in which youth are individually removed from their cells, one at a time, to use the bathroom.  All youth are denied meaningful human interaction.  In some instances, youth are confined to their cells continuously and not taken out at all.

61.    Youth who staff perceive as 'difficult' or a 'problem,' often due to manifestations of their disabilities, are often kept locked in their cells indefinitely because staff are concerned that they do not have sufficient staffing support to manage these youth.

62.    All youth in solitary confinement experience little to no meaningful human interaction and are denied recreation and socialization with other youth.

63.    Despite facilities being equipped with cafeterias, OCFS does not permit youth in solitary confinement to eat with other youth or staff.  Instead, youth are required to eat all meals alone in their locked cells.

64.    OCFS also denies youth in solitary confinement access to programming and fails to provide youth the educational services to which they are entitled.  While in solitary confinement, youth do not interact with teachers or receive any individualized instruction.  On limited occasions, youth are given educational worksheets, but they receive no instruction, feedback, or engagement with teachers or other students.

65.    OCFS also restricts phone calls and family visitation for youth in solitary confinement, depriving youth of vital sources of emotional support and undermining their connections to family and community.

66.    OCFS often prohibits youth from having personal belongings or reading material beyond a few books while in solitary confinement.  Youth are left alone.  With little mental stimulation, youth frequently become afraid, anxious, and confused.

**B.  OCFS Relies on a Patchwork of Inconsistent and Misleading Regulations, Policy, and Invented Terminology to Carry Out Its Unlawful Solitary Confinement Practices**

67.    OCFS has several regulations and policies that permit some isolation or segregation of youth in placement.  At times, OCFS purports to rely on these regulations and policies to justify the use of solitary confinement for extended periods of time.  But these regulations and policies are inconsistent and vague.  And OCFS, in fact, often fails to comply with them or exploits their vague and dangerous loopholes to impose unlawful solitary confinement on the youth in its care and custody.

68.    OCFS has promulgated two sets of regulations that authorize confining youth to their cells while in secure placement facilities.  *See* 9 NYCRR §§ 168.2, 168.4.

69.    The first, termed "room confinement," permits OCFS to confine a child "*only* in cases where a child constitutes a serious and evident danger to himself or others."  9 NYCRR § 168.2(b) (emphasis added).  "Room confinement shall not be used as punishment."  *Id.*  Moreover, OCFS is required to provide reading material, and educational staff must be available to provide instruction to the youth.  *Id.* § 168.2(h); *see also* N.Y. EDUC. LAW §§ 112; 3204.  Finally, each use of room confinement "lasting more than one hour" must be reported to OCFS leadership.  9 NYCRR § 168.2(j).

70.    OCFS policy based on the "room confinement" regulation requires recreation for at least 60 minutes per day.  PPM 3247.15.  It also states that "youth shall be released from confinement as soon as their behavior ceases to be a serious and evident danger to themselves or others."  *Id.*

71.    Yet OCFS routinely authorizes room confinement exceeding 24 consecutive hours. Contrary to this regulation and policy, OCFS does not release youth after they no longer pose a serious or evident danger to themselves or others; nor does OCFS provide youth with education and recreation as required.  Moreover, room confinement is often used for punitive purposes or for facility management purposes.

72.    OCFS has also promulgated vague regulations authorizing "group confinement" that it uses to impose solitary confinement.

73.    Group confinement is defined to "include situations where a child is separated from the general population and normal daily program by confinement in a locked [] living unit." 9 NYCRR § 168.4(a).  Group confinement is permitted when OCFS determines that a child constitutes a serious and evident danger to himself or others, is himself in serious and evident danger, or "demonstrates by his own behavior or by his own expressed desire, that he is in need of special care and attention in a living unit separate from his normal surroundings."  *Id.* § 168.4(b).

74.    Under the regulations, group confinement may not be used as a punishment.  9 NYCRR § 168.4(b).  And facilities must maintain a "daily log indicating the number of children in group confinement and their period of stay in the program."  *Id.* § 168.4(d).  There is nothing in the regulations specifying how this decision is made, who makes it, or how a youth could challenge his or her placement in this status.  Nor is there anything specifying how and when youth are permitted to be released from group confinement, or dictating their conditions while in this status.

75.    Despite the regulation's use of the term "group confinement" and its reference to a locked "living unit," OCFS uses this regulation to subject youth to solitary confinement for indeterminate periods of time—locking youth alone in their cells and depriving them of interaction with other youth and staff, programming, and education.  For example, OCFS maintains that the living conditions at Brookwood's Wing 11, where Named Plaintiff Marcus F. was held in solitary confinement, are authorized as "group confinement."  OCFS routinely imposes group confinement to punish youth in violation of the "group confinement" regulations.

76.    OCFS has also issued policies to allow solitary confinement even when not contemplated by regulation.  Under OCFS's "special programs" policy, for example, youth with "behaviors that require enhanced staff supervision" may be subjected to "room confinement" or "group confinement," as defined by the regulations.  PPM 3247.65.  Although the special program must be approved every 14 days, this type of segregation can be extended indefinitely.  OCFS also purports to justify solitary confinement in secure placement facilities as a "special program."

77.    Finally, OCFS also imposes solitary confinement through the imposition of "modified programming," "lockdown," or "red book" in its secure placement facilities.  These statuses, often applied across entire units or facilities, are not defined in policy or regulation, but result in the imposition of solitary confinement on youth.  Because there is no authority for these statuses, there are no standards or limits governing the conditions imposed on youth subjected to these statuses or the duration of the solitary confinement, nor are there mechanisms for youth to appeal the imposition of these statuses.

**C.  Youth Are Extremely Vulnerable to the Harms of Isolation**

78.    Solitary confinement puts youth at a substantial risk of serious harm to their social, psychological, and emotional development.  Solitary confinement can perpetuate, worsen, or even

precipitate mental health concerns that, in turn, can lead to long-term and often permanent changes in an adolescent's brain development.

79.    In 2012, the United States Attorney General's National Task Force on Children Exposed to Violence concluded that "[n]owhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement."[6]

80.    Because youth are still developing socially, psychologically, and neurologically, they are especially susceptible to psychological harms caused by isolation, including psychosis, post-traumatic stress disorders, major depression, anxiety, paranoia, and suicide.[7] These risks are even higher for youth with pre-existing mental health conditions, which in New York includes most of the youth in the juvenile justice system.

81.    Even brief periods of isolation can cause youth to "become impaired," "incapable of processing external stimuli," or "hyperresponsive" to their surroundings.[8] Indeed, youth, including some Named Plaintiffs, have described "losing themselves" in these conditions, unable to cope with the loneliness and isolation.

82.    Studies have shown that youth exposed to isolation may be at a heightened risk of suicidal ideation. Indeed, as DOJ has reported, more than half of suicides within juvenile correctional facilities occur when a child is in some type of isolation.[9]

---

[6] Robert L. Listenbee, Jr. et al., *Report of the Attorney General's National Task Force on Children Exposed to Violence* 178 (Dec. 12, 2012); *see also* Statement of Interest of the United States, *V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554 (N.D.N.Y. 2017) (No. 9:16-cv-1150-DNH-DEP), *available at* https://www.justice.gov/crt/case-document/file/1209976/dl?inline.

[7] Sarah-Jayne Blakemore & Kathryn L. Mills, *Is Adolescence a Sensitive Period for Sociocultural Processing?*, 65 ANN. REV. OF PSYCH. 187, 189 (2014); *see also* Delia Fuhrman et al., *Adolescence as a Sensitive Period of Brain Development*, 19 TRENDS IN COGNITIVE SCIS. 558, 561–62 (2015).

[8] Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U. J. L. & POL'Y 325, 331 (2006).

[9] Lindsay M. Hayes, Dep't of Justice Office of Juvenile Justice and Delinquency Prevention, *Juvenile Suicide in Confinement: A National Survey*, viii (Feb. 2009), https://www.ncjrs.gov/pdffiles1/ojjdp/213691.pdf; *see also* Fatos Kaba et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104 AMER. J. PUB. HEALTH 442, 444 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3953781/pdf/AJPH.2013.301742.pdf.

83.    Self-harm episodes in OCFS secure placement rose 100% between 2018 and 2023.  The "expression or gesture of suicide" rose 667%, growing in number from three to 23 incidents.[10]

84.    There have been several suicide attempts by youth in secure placement facilities.  In spring 2025, a youth attempted suicide while in isolation.  The youth was discovered by staff at the last minute and was cut down.

85.    In July 2025, another youth attempted suicide.

86.    Unwilling to participate in this inhumane treatment, clinical staff at these facilities have quit their jobs.

87.    Named Plaintiffs have experienced and continue to experience a deterioration in their mental health in OCFS custody as a result of these policies and practices.  Some have expressed suicidal ideation.

88.    For example, the inhumane conditions of solitary confinement caused Christopher M. to experience intrusive thoughts and suicidal ideation.  Christopher expressed his intent to take his own life to OCFS staff while placed in solitary confinement.  Another Named Plaintiff, Marcus F., suffers mental anguish and distress, which only worsens with each subsequent period of solitary confinement.

89.    In addition, by depriving youth of human interaction, solitary confinement impairs a youth's ability "to develop a healthy functioning adult social identity."  Indeed, youth are even less likely than adults to recover from isolation given that "they are in an uncertain, unformed state

---

[10] *Office of Children and Family Services: Oversight of Juvenile Justice Facilities*, OFF. OF THE N.Y. STATE COMP-TROLLER at 12 (Report No. 2022-S-13, Apr. 2024), https://www.osc.ny.gov/files/state-agencies/audits/pdf/sga-2024-22s13.pdf?utm_medium=email&utm_source=govdelivery.

of social identity."[11]  For youth with trauma histories, placement in isolation may result in particularly extreme emotional reactions.

90.    The long-term effects of solitary confinement are both psychological and physical.  Research indicates that solitary confinement can lead to irreparable brain damage during critical periods of neurological development.[12]  The trauma experienced in solitary confinement can alter hormonal functioning and lead to stunted brain development and advanced biological aging.

91.    The repercussions of solitary confinement for those with behavioral, psychiatric, or intellectual disabilities are particularly acute, as their disability may exacerbate the harm they experience in solitary confinement and simultaneously trigger a manifestation of their disability that then purportedly justifies extending the duration of their isolation.

92.    Major medical and mental health organizations, including the American Psychological Association, the American Academy of Child and Adolescent Psychiatry, the American Medical Association, and the American Public Health Association, recognize the risks of solitary confinement for youth and many categorically oppose its use.

93.    For example, the American Psychological Association, recommends that "solitary or room confinement of youth—involuntary isolation of a youth in a locked room or cell—be prohibited" except in truly emergency circumstances in response to an imminent danger.

94.    Similarly, major correctional associations, including the American Correctional Association ("ACA"), National Commission on Correctional Health Care, and Council of Juvenile Correctional Administrators, oppose solitary confinement of youth.

---

[11] Anthony Giannetti, *The Solitary Confinement of Juveniles in Adult Jails and Prisons: A Cruel and Unusual Punishment*, 30 BUFF. PUB. INT. L.J. 31, 47 (2012).
[12] Delia Fuhrman et al., *Adolescence as a Sensitive Period of Brain Development*, 19 TRENDS IN COGNITIVE SCIS. 558, 561–62 (2015); Laura Dimon, *How Solitary Confinement Hurts the Teenage Brain*, THE ATLANTIC (Jun. 30, 2014), https://www.theatlantic.com/health/archive/2014/06/how-solitary-confinement-hurts-the-teenagebrain/373002.

95.    For example, the ACA recognizes that "isolating a youth for extended periods can have serious psychological and developmental consequences."  The ACA opposes isolation for punishment unless there is an immediate risk of harm to youth or others.

96.    The National Council of Juvenile and Family Court Judges also oppose solitary confinement of youth unless absolutely necessary to prevent imminent harm to youth or others.

97.    There is strong international opposition to the solitary confinement of youth as well.  The United Nations Special Rapporteur on Torture concluded that solitary confinement amounts to torture and recommended prohibiting any use of solitary for vulnerable groups, including youth.

98.    Recognizing this harm, jurisdictions across the country have been shunning this practice for at least a decade.  New York State itself has banned the use of solitary confinement for youth in adult facilities.[13]  Twenty-nine states have banned the use of punitive solitary confinement for youth through statute, regulation, policy, or court order.

99.    DOJ ended the practice of allowing the use of solitary confinement for juveniles in the custody of the Federal Bureau of Prisons.

100.  DOJ also issued a set of "Guiding Principles" intended as best practices for correctional facilities, including those at the state and local level.  Under Guiding Principle #41, "[j]uveniles should not be placed in restrictive housing."  Under Guiding Principle #42, in "very rare situations," juveniles may be separated from others, and then only "as a temporary response to behavior that poses a serious and immediate risk of physical harm."  Such placement "should be brief, designated as a 'cool down' period, and done only in consultation with a mental health professional."

---

[13] Humane Alternatives to Long-Term Solitary Confinement (HALT) Act, Ch. 93, 2021 N.Y. Laws 93.

101.  Solitary confinement is not just harmful; it also does not deter future misbehavior.  In fact, research has shown that the practice does the opposite, exacerbating the behavior that led to discipline in the first place.

102.  In Ohio, for example, the Director of the Department of Youth Services found that solitary confinement "does not prevent violence or reduce assaults on staff and youth; instead . . . it actually increases violence."  Analysis of five years of data showed that as the rate of solitary confinement increased, so did acts of violence, and that when the Department cut its use of solitary confinement for juveniles by 89%, it saw a 22% drop in violent acts.

103.  Data confirm that eliminating the use of solitary confinement makes facilities safer.  After Oregon implemented a policy banning punitive isolation, there was a 77% decrease in incidents.

### D.  Named Plaintiffs

#### 1.  Marcus F.

104.  Marcus F. is a Black, 18-year-old young person who was born in the Bronx and has lived in New York City with his mother and two older siblings his entire life prior to his current incarceration.  Marcus enjoys practicing yoga and meditation and wants to start his own business when he grows up.

105.  Marcus maintains a close relationship with his mother and two older siblings, both of whom have neuro-developmental disorders.

106.  When Marcus was a child, he was diagnosed with Oppositional Defiant Disorder and Attention Deficit Hyperactivity Disorder for which he received therapeutic services.  In 2023, when he was 15 years old, Marcus was diagnosed with a learning disability, and his school developed an Individualized Education Program ("IEP") recommending special education services.  At

the time, he was reading at a 6th grade reading level.  Since being incarcerated, OCFS has provided Marcus with prescription medication to address mental health challenges.

107.  On December 18, 2024, Marcus was adjudicated, or found guilty, as a Youthful Offender and sentenced to secure placement in the care and custody of OCFS.[14]

108.  Prior to his sentencing and subsequent transfer to OCFS secure placement, Marcus spent approximately 11 months in a New York City pre-trial detention facility.  Detention staff commended Marcus's exemplary behavior, consistent engagement with rehabilitative services, and respect for authority in court-ordered reports.  Marcus's case manager reported that Marcus demonstrated a "remarkable level of respect and cooperation towards the facility's staff members" and that "his open communication style continues to foster a sense of trust and mutual respect between himself and the staff."

109.  In a report to the trial court, detention staff described Marcus's active participation in conflict resolution while in detention and noted his ability to show both "vulnerability" and "maturity" by being "resourceful, less aggressive and receptive to staff directives."  The detention staff also reported that Marcus held himself accountable through his proactive engagement in services and was learning to effectively problem-solve.

110.  Marcus earned two dozen certifications during his time in detention, including numerous Certificates of Participation for his enthusiastic contributions in class, Passages Academy's Citizenship Award, Student of the Week Awards, and many Academic Achievement Awards and Certificates of Recognition for Outstanding Improvement in various classes.  Marcus is devoted to pursuing higher education in hopes of fulfilling his dream of becoming a business owner.

---

[14] Youthful Offender treatment provides the sentencing judge the opportunity to replace a criminal conviction with a confidential, non-criminal adjudication and reduced prison sentence pursuant to CPL § 720.10.

111.  Since sentencing, Marcus has been placed at both Brookwood and MacCormick.  OCFS's repeated use of solitary confinement in these facilities has undermined the rehabilitative progress Marcus demonstrated while incarcerated in detention and is continuing to cause him significant harm.

112.  During the approximately six months Marcus spent at Brookwood, OCFS staff placed him in Wing 11—the facility's isolation housing unit known among youth and staff as "the box"—on four separate occasions.

113.  These periods of solitary confinement often lasted weeks at a time, during which Marcus was locked alone in his cell up to 23 hours a day.

114.  While holding Marcus on Wing 11, OCFS denied him access to education, programming, and meaningful contact with peers or staff.  Occasionally, OCFS staff allowed Marcus to leave his cell for one hour per day, during which time he was permitted to play basketball with a staff member or exercise alone.  Even this one hour of recreation was not guaranteed.

115.  While in solitary confinement on Wing 11, Marcus ate all his meals in isolation without any opportunity to interact with peers.

116.  Phone calls and family visitation, vital sources of emotional support, were weaponized by OCFS staff as punishment, and revoked when OCFS relegated Marcus to solitary confinement.

117.  In addition to the solitary confinement on Wing 11, OCFS also repeatedly imposed punitive solitary confinement on Marcus when he was assigned to the general population units at Brookwood.

118.  During these periods of solitary confinement, Marcus was only allowed out of his cell to use the bathroom or phone while no other young person was in the common area of the unit.  As a result, Marcus remained isolated even during these brief periods out of his cell.

119.  In solitary confinement in the general population units, Marcus ate all his meals while locked in his cell, was deprived of education and programming, and was barred from in-person family visitation.

120.  Marcus suffered great mental anguish and distress while at Brookwood, and his condition worsened with each subsequent period of isolation.

121.  Since his transfer to MacCormick in July 2025, OCFS continues to subject Marcus to punitive solitary confinement, subjecting him to punitive solitary confinement on at least three separate occasions, each lasting days or weeks at a time.

122.  During these periods of solitary confinement, staff release Marcus from his cell for only one to two hours per day, and even then, only to shower, use the bathroom, or make a phone call. He eats all of his meals while locked in his cell, alone.  While on this status, he receives no education, no programming, and only sporadic, occasional recreation time, alone.

123.  OCFS also subjects Marcus and other youth to extended isolation during facility-wide "lockdowns," which occur whenever sufficient staff are unavailable, or the facility is unable to manage the youth in its custody.  During these lockdowns, every youth on a unit is locked in their cell for 20 to 24 hours or longer.  Staff perceive Marcus as 'problematic,' justifying keeping him in his cell for longer periods as punishment for perceived 'difficult' behavior that manifests as a result of his disabilities.  Marcus experienced lockdowns at both Brookwood and MacCormick.

124.  During these lockdowns, staff are often not present in the unit for hours at a time, leaving youth locked in their cells without supervision or access to basic needs.  Marcus was forced on multiple occasions to create disturbances, by banging on his door or yelling, to get staff attention in order to use the bathroom, get water, or seek help.

125.  Marcus witnessed at Brookwood, and continues to witness at MacCormick, OCFS's use of solitary confinement on other youth on his current unit and in other units in the facilities.  Residents yell and bang on cell walls throughout the day and night.

126.  Marcus has mentally deteriorated as a result of his placement in solitary confinement.

127.  While in solitary, Marcus attempts to meditate and practice yoga to maintain his sanity, but the constant noise, social deprivation, and isolation make it difficult.  Marcus also tries to pass time by sleeping or reading the single book OCFS permits him to have in his cell.

128.  Conditions at both Brookwood and MacCormick have been so oppressive that Marcus is seriously considering a request to transfer to an adult prison operated by the New York State Department of Corrections and Community Supervision ("DOCCS") to escape the harm he suffers from OCFS's solitary confinement practices.

129.  Marcus attempted to use the OCFS grievance process but was denied access and was discouraged and intimidated from doing so.

130.  As a result, Marcus fears staff would withhold a transfer out of isolation and back to the general population or delay his transfer to another facility if he were to file a formal grievance.

131.  At MacCormick, he was told by staff that staff had only "Level 2" and "Level 3" grievance forms, preventing him from initiating the formal process.

132.  While in solitary confinement in September 2025, Marcus verbally complained to the facility director and objected to the practice of solitary confinement at MacCormick.  The director eventually allowed Marcus to reintegrate into his unit, but less than a month later, Marcus was again subjected to solitary confinement.

133.  OCFS staff have intimidated Marcus and his family in connection with speaking to counsel about his conditions.  In November 2025, his mother was questioned by staff regarding the

substance of Marcus's communications with counsel, and staff suggested that speaking with attorneys was not good for Marcus.

134.  Marcus feels a profound sense of hopelessness and defeat.

   *2.  Garrett M.*

135.  Garrett M. is a 16-year-old Black boy born and raised in New York City.  Prior to his incarceration, Garrett lived in Brooklyn with his father, stepmother, and siblings.  He is an avid reader of fantasy novels.  He particularly enjoys the Harry Potter and Eragon series.  And he enjoys playing video games, creative writing, and drawing anime.

136.  Throughout his life, Garrett experienced significant trauma, including domestic violence, sexual abuse, chronic bullying, and community violence.  Garrett was diagnosed at an early age with Attention Deficit Hyperactivity Disorder, Intermittent Explosive Disorder, and Oppositional Defiant Disorder.

137.  Garrett also received an IEP under the educational classification of Emotional Disturbance.  It is mandated by law that Garrett receive special education services under his IEP.

138.  On April 8, 2025, Garrett was adjudicated as a Juvenile Delinquent in Family Court and ordered to be placed in the care and custody of OCFS.

139.  Garrett is currently at Industry where he resides on the Secure Upper Campus.

140.  OCFS has subjected and continues to subject Garrett to repeated and prolonged periods of solitary confinement.  Garrett estimates that OCFS has placed him in solitary confinement for at least half of his time in OCFS custody.

141.  For approximately the first month of his placement, OCFS confined Garrett to his locked cell for 22 to 24 hours each day due to the perception that he posed behavioral problems.  During

this period, he was denied access to education and programming and remained isolated with no interaction with his peers.

142.  Even after this initial period, OCFS continues to place Garrett in solitary confinement for extended periods lasting weeks to months at a time as punishment.

143.  For example, in August 2025, OCFS staff placed Garrett in solitary confinement for a 14-day term that was then extended to a month.

144.  During these periods of solitary confinement, Garrett remains locked in his cell for between 22 and 23 hours each day, without any meaningful peer contact or access to required educational programming.  On limited occasion, Garrett has been provided with educational worksheets without any instruction, feedback, or interaction with a teacher.  Garrett is only permitted to leave the cell for an hour at a time to use the bathroom, shower, call loved ones, and, sporadically, visit the facility's gym.  Garrett remains isolated during these limited periods outside of his cell.  He completes these essential tasks alone.

145.  Even when Garrett is not formally assigned to solitary confinement, he experiences isolation more frequently than his peers as punishment for behavior staff perceives as 'difficult' that manifests as a result of his disabilities.

146.  When insufficient staff are available to supervise a full unit, staff are given discretion to lock in all youth and then permit small groups of residents out of their cells simultaneously for brief periods of time to shower or make phone calls.

147.  But while other youth are allowed limited out-of-cell time, Garrett remains locked in his cell and isolated.

148.  As a result, there have been days when Garrett, and other youth perceived as 'problematic,' remain locked in their cells for consecutive 24-hour periods.

149. Although virtually no OCFS cells have a toilet and sink, for several months, OCFS assigned Garrett to a 'wet' cell equipped with a toilet and sink. This move was to enable prolonged periods of solitary confinement without having to let Garrett out of his cell to use the bathroom. The 'wet' cell, located at the far end of the unit behind a locked door, has no window and isolates him from other residents. While in the 'wet' cell, if Garrett was let out, it was only to shower, make a phone call, or pace alone in an empty corridor.

150. Garrett has also experienced frequent unit-wide "lockdowns," resulting in solitary confinement. During these and other periods of solitary confinement when Garrett is in a 'dry' cell, he and other youth on his unit are often forced to urinate and defecate in food containers or in bottles when staff fail to respond to their requests for bathroom access. Garrett and others have banged on their doors or yelled for assistance for hours without receiving a response.

151. In one instance, Garrett suffered a nosebleed. Despite Garrett calling for staff, staff failed to timely respond, leaving Garrett in his cell covered in blood.

152. Whether subjected to solitary confinement in a wet or dry cell, Garrett is forced to eat all his meals locked in his cell and is deprived of education and programming.

153. Garrett has deteriorated mentally as a result of OCFS's use of solitary confinement. He feels anxious and depressed and often acts out to get attention and to mitigate the loneliness and isolation he suffers daily.

154. Garrett has spent an aggregated four months in solitary confinement.

155. Garrett has filed approximately 15 grievances regarding various conditions impacting his placement. At least twice, he grieved OCFS's policy and practice of subjecting him to isolation. He received no response regarding any of the 15 filed grievances.

### 3. Christopher M.

156.  Christopher M. is a Black 20-year-old young person from Harlem, New York.  Prior to his incarceration, Christopher lived there with his mother.  He has lost loved ones, including a close friend, to community violence and witnessed the 2022 Harlem River Park mass shooting.

157.  On July 4, 2024, Christopher became a father to a baby girl whom he adores.  Upon release, he plans to reunite with his daughter and work in construction.  Christopher would ultimately like to become a real estate agent.

158.  On June 1, 2025, Christopher was convicted as an Adolescent Offender and sentenced to secure placement in the care and custody of OCFS.

159.  Christopher is currently in OCFS custody at Goshen.

160.  Christopher is routinely subjected to solitary confinement at Goshen.  Christopher has experienced solitary confinement due to OCFS's inability to adequately manage youth in its care.

161.  Christopher's entire housing unit is often subjected to "lockdowns."  The lockdowns result in all youth on the unit being subjected to solitary confinement for non-disciplinary reasons almost every weekend.  When Christopher's unit is on lockdown, he is allowed out of his cell for a maximum of thirty minutes each day.  He eats alone in his cell, is deprived of programming and recreation, and is prevented from going to the bathroom in a timely manner.

162.  Although youth regularly have no choice but to urinate into plastic bottles, food containers, or garbage bins inside of their cells, Christopher refuses to do so.  On at least one occasion of solitary confinement, he was denied access to a toilet until three in the afternoon.  This has made him feel demoralized and less than human.

163.  While in OCFS solitary confinement, Christopher has been completely deprived of meaningful educational services.  Before his transfer, Christopher made substantial progress towards his High School Equivalency diploma.

164.  At Goshen, despite repeated requests, he has not been able to take a single GED class towards his High School Equivalency diploma, nor has he been provided with any direct instruction.  He has yet to be assigned a teacher.

165.  Instead, OCFS staff only provide him with worksheets, without feedback or teacher support.

166.  Christopher's mother and attorney have attempted to send him books to mitigate the negative psychological effects of his solitary confinement, but OCFS prohibits books from outside the facility, further depriving Christopher of stimulation and coping mechanisms.

167.  OCFS restricts in-person visitation for Christopher to visits with his mother and his infant daughter once every five weeks.  Despite the critical importance of family contact for Christopher's mental health and rehabilitation, he is subjected to this restriction even while in solitary confinement.

168.  OCFS staff limit Christopher's phone calls to 15 minutes, as multiple young people compete for phone access during the short periods they are allowed out of their cells.

169.  Christopher's mental health has significantly deteriorated as a result of OCFS's imposition of solitary confinement.  In September 2025, OCFS placed Christopher on suicide watch after he threatened to kill himself if staff continued to keep him in isolation.

170.  Nearly every day, Christopher feels compelled to trigger a disturbance solely to get the attention of higher-level staff so he can escape the hopelessness of solitary confinement even for a brief period.

171.  Before his OCFS placement, Christopher was incarcerated in the Robert N. Davoren Center for young adults on Rikers Island ("Rikers") run by New York City's Department of Corrections.  Although Rikers is notorious for inhumane and dangerous conditions, including pervasive violence and chronic mismanagement so severe that a federal receivership has been deemed necessary, Christopher states that conditions there were *significantly better* than those he is subjected to in OCFS custody.

172.  At Rikers, Christopher had regular access to daily schooling, religious services, organized recreational outlets, including a basketball team, unrestricted bathroom access, and liberal access to telephones.  He was not subjected to solitary confinement.

173.  Despite the hardships at Rikers, Christopher felt mentally healthy because he had programming, education, and meaningful interaction with others.  By contrast, at OCFS he has none of these things.

174.  Conditions at Goshen have been so psychologically damaging that Christopher is seriously considering requesting transfer to an adult prison operated by DOCCS, notwithstanding the inherent risks, simply to escape the severity of OCFS's solitary confinement practices.

175.  On October 15, 2025, Christopher's mother grieved OCFS's policy and practice of solitary confinement on his behalf in a letter sent to Goshen and Governor Hochul.  This grievance was forwarded to OCFS leadership.

176.  In her grievance letter, Christopher's mother expressed deep concern for her son's "well-being and mental health due to the inhumane conditions he is enduring."  She reported that Christopher has been "locked in his cell for more than 20 hours a day," described the isolation as "compounded by the lack of educational support—there are no teachers on-site, and the only academic

material provided are worksheets that he is expected to complete independently." Further, she grieved the "excessively restrictive" visitation policy.

177. Christopher's mother warned of the "long-term negative impact" on Christopher. She described how the inhumane conditions at OCFS contribute to her son's deteriorating mental health, sharing that Christopher "attempted to take his own life" and "is experiencing intrusive thoughts and suicidal ideation."

178. She requested on Christopher's behalf that he be transferred to an adult facility so he can receive "necessary care and support."

179. Despite the grievance, OCFS has not ceased its policy and practice of solitary confinement by continuing to place Christopher and other youth in solitary confinement, nor has Christopher been provided with educational instruction or access to books provided by his mother.

    *4. Isaac R.*

180. Isaac R. is a 17-year-old Black boy born and raised in New York City. Prior to his incarceration, he lived with his mother and younger sister, with whom he shares a close and supportive bond.

181. Family has always been a central part of Isaac's life; he has strong relationships with his extended relatives and fondly recalls fishing with his grandfather, riding bicycles with his grandmother, taking his sister to the park, and spending time with his cousins playing basketball and video games.

182. Isaac is both academically gifted and athletically talented. In high school, he excelled as a competitive football player, traveling locally and nationally with his team. He was equally dedicated to his education, earning a place on the honor roll at his community school.

183. Isaac suffers from post-traumatic stress disorder.

184.  On February 11, 2025, Isaac was convicted as an Adolescent Offender and sentenced to secure placement in the care and custody of OCFS.

185.  Even in pre-trial detention, before entering OCFS custody, Isaac remained focused on his academic growth.  He earned dozens of achievement certificates and was nominated as a Freedom School Scholar by the school located at the Brooklyn detention center.

186.  While in detention, Isaac completed the Hunter College Restorative Justice Program, a voluntary program promoting restorative justice practices, including harm reduction and accountability.  With the Restorative Justice Program, Isaac engaged in group and individual readings, discussions, and writing projects.

187.  Isaac is only two Regents exams away from earning his high school diploma and wants to begin college coursework.  Isaac's compassion for animals and his strong interest in science have inspired him to seek to pursue a career in veterinary medicine.

188.  Throughout Isaac's time in pre-trial detention, court-ordered reports documented consistent praise from detention staff for Isaac's conduct, his participation in rehabilitative programming, and his respectful interactions with staff and peers.  In a pre-sentencing report to the trial court, his program counselor reported that Isaac "has the potential to become somebody great," noting that Isaac completed every program available to him.

189.  Detention staff described Isaac's active participation in conflict resolution while in pre-trial detention and noted his ability to show both "vulnerability" and "maturity" by being "resourceful, less aggressive and receptive to staff directives."  Staff highlighted Isaac's ability to hold himself accountable and his proactive engagement in meaningful programming.

190.  Isaac is currently placed in OCFS custody at Goshen.

191.  Isaac's maturity and responsible conduct have continued during his incarceration at Goshen.  Facility staff selected him to represent his housing unit on the Resident's Council, and he has advanced within OCFS's behavioral management system.

192.  Undermining his documented commitment to rehabilitation, Isaac has been repeatedly subjected to solitary confinement by OCFS.

193.  In the summer of 2025, OCFS confined Isaac to his cell for seven consecutive days as punishment for an incident.  During that time, he was denied access to school, programming, rehabilitative services, and in-person visitation.  Staff allowed Isaac out of his cell only for brief windows, alone, to use the bathroom, shower, and, on occasion, exercise.  He was only occasionally permitted to make phone calls during this time.

194.  Isaac continues to be subjected to solitary confinement for non-disciplinary reasons when OCFS is unable to adequately manage the youth in its custody.  Most notably, in February and March 2025, Isaac and the other young people in his unit were placed in solitary confinement for about a month as a result of a "lockdown."

195.  During this period, youth at Goshen were held in their cells for 24 hours a day and permitted only "one-in, one-out" bathroom access.  There was no education, no programming, no visitation, no recreation, and almost no opportunity to use the telephone.  Isaac spent this month alone, sleeping or reading the few books permitted in his cell.

196.  Since winter 2025, OCFS has continued to impose non-disciplinary solitary confinement on Isaac, continually disrupting and dominating his daily life at Goshen.  Isaac is routinely locked in his cell for at least 20 hours each day.  On such days, he is permitted two periods of two hours of time out of his cell with a small number of other residents in his unit.

197.  After periods of repeated isolation, Isaac's mental health deteriorates, and his post-traumatic stress response is exacerbated.  When his entire unit is locked in their cells for long periods, the tension on the unit grows.  In those circumstances, Isaac is left with few coping measures. During one two-day period of solitary confinement in the fall of 2025, Isaac's mother was so concerned about her son's mental health that she called the facility to request he at least have an opportunity to meet with a clinician to mitigate his mental distress.

198.  In spring 2025, Isaac's mother grieved OCFS's practice of solitary confinement and the impact of the conditions on Isaac's mental health to Defendant Harris-Madden by letter.  Despite this effort, OCFS continues to subject Isaac to solitary confinement.

199.  In November 2025, Isaac obtained and completed a grievance form to staff on his unit regarding OCFS's policy and practice of solitary confinement.  Although not required by OCFS's written policy, Isaac was told by OCFS staff that any grievance must be signed by OCFS staff *before* the form can be submitted.  The staff member who Isaac was told must sign the form has been absent from the facility.  This requirement creates an additional hurdle for Isaac in an already challenging grievance process.

### E.  Defendants Are Aware of the Use of Solitary Confinement and Associated Risks and Have Chosen to Ignore Those Risks

200.  Defendants have repeatedly been put on notice of the substantial risk of serious harm posed by OCFS's use of solitary confinement.  They have received numerous and significant complaints from youth, advocates, leadership of the Public Employees Federation ("PEF"), the labor union representing OCFS professional staff, and even legislators.  Despite this notice, OCFS has continued its routine use of solitary confinement.

201.  In April 2024, the Office of the New York State Comptroller sent its report to OCFS documenting problems at OCFS placement facilities, including the staffing crisis and the resultant

failures in oversight of youth care. The Comptroller noted that staffing issues were "particularly acute at secure facilities, which were operating, on average, 38% below full staffing levels."

202. In significant part, OCFS's staffing shortage has led to a reliance on solitary confinement in OCFS secure placement facilities. Since the report, the staffing shortage has only worsened.

203. PEF, the union representing a portion of OCFS staff at secure placement facilities, has been ringing alarm bells for over a year about staffing shortages and the resulting isolation of youth. PEF has raised these issues with Defendant Harris-Madden and her executive team, specifically highlighting the harm to youth held in isolation in these facilities. No significant change has occurred.

204. In June 2025, after Defendants had taken no meaningful action to address these issues, PEF reached out to state legislators, writing, "Youth [in OCFS secure placement are] reportedly confined to their rooms for up to 23 hours a day, often denied basic access to restrooms and served food in unsanitary conditions. A suicide attempt occurred under these conditions; only the quick action of a PEF member, who cut down the youth in time, prevented tragedy. The fact that these youth—predominantly Black and Brown—are forced to live in squalid, dehumanizing conditions is unconscionable."

205. Defendants know that staffing deficiencies increase OCFS's reliance on solitary confinement and deprivations of youth's access to basic toileting, mental health care, social interaction, education, and other rehabilitative programming.

206. OCFS has been experiencing this staffing crisis since at least 2021. Less than half of many of the staff positions in OCFS secure facilities are filled at any given time. For example, in August 2024, only 31% of staff positions were filled at Brookwood, 32% at Industry, 42% at MacCormick, and 44% at Goshen, and the situation has not meaningfully improved since then.

207.  At least half of the staff positions responsible for the daily supervision of youth, namely Youth Support Counselors ("YSCs") and Youth Support Specialists ("YSSs"), are vacant.  YSCs are required to supervise, guide, and mentor youth in secure placements.  YSSs directly supervise youth and are required to ensure the physical and emotional safety of youth.  Despite the importance of these positions, up to 80% of these positions are unfilled.[15]

208.  After touring some of the secure placement facilities and speaking with youth and staff in September 2024, several state legislators have raised the issues of staffing and the isolation of youth with OCFS.

209.  Even OCFS's own policies and practices require notice to Defendants and OCFS leadership for certain types of isolation.  For example, the continued use of "room confinement" beyond 24 hours on any individual youth must be reported to the OCFS leadership.  9 NYCRR § 168.2(l).  OCFS leadership also knows when an entire secure placement facility is placed on lockdown.

210.  Youth, their families, and their attorneys, including Named Plaintiffs and their families, have often brought the use of solitary confinement in OCFS secure placement facilities and the resulting harm to youth to the attention of OCFS, including Defendants specifically, but Defendants have ignored those complaints.

211.  Youth in solitary confinement must ask OCFS staff to obtain a grievance form.  Pursuant to OCFS's solitary confinement policy and practice, these same staff have discretion over the conditions the youth are subjected to, including the provision of out-of-cell time, access to telephones, access to toilets and showers, access to recreation, and even the duration of isolation.

---

[15] For example, there should be at least 49 YSCs at Industry, yet in October 2024 there were only 22.  Similarly, half the required YSC positions at MacCormick were vacant, as were a quarter of the YSC positions at Goshen and Brookwood.  As of May 2025, there were only 10 YSC positions filled at Industry.  Likewise, secure placement facilities have shockingly low numbers of YSS staff.  In August 2024, 83% of YSS positions were vacant at Industry, 81% at Brookwood, 70% at Goshen, and 65% at MacCormick.  At Brookwood, for example, that amounts to 41 staff being available to do the work of 220 people.

212.  OCFS staff have denied youth, including Named Plaintiffs, grievance forms necessary to initiate the formal grievance process.

213.  Many youth, including Named Plaintiffs, fear retaliation for submitting grievances within the facility.  Given the broad discretion of OCFS staff to control access to essential services for youth in solitary confinement and to extend the duration of the confinement, youth's fear of retaliation is well founded.  Youth and their families, including Named Plaintiffs, are even subjected to intimidation for speaking with attorneys about their conditions.

214.  In addition, although not required by OCFS's written policy, youth, including Named Plaintiffs, are told by staff that any formal grievance must be signed by OCFS staff *before* the form can be submitted.  This requirement demonstrates a lack of confidentiality in the grievance process and creates an additional hurdle for and chilling effect on the grievance process that deters youth from submitting formal grievance forms when they wish to complain about conditions.

215.  Moreover, OCFS policy does not permit parents, guardians, attorneys for youth, or other adults in the youth's life to help file a formal grievance form.

216.  Several youth, including Named Plaintiffs and families of youth, have alerted OCFS to the harm of their solitary confinement, but nothing has changed.  Several youth, including Named Plaintiffs, have asked to be released from solitary confinement.  OCFS staff did not respond or removed the youth from solitary confinement only to confine them in solitary again shortly thereafter under the same conditions.

217.  Several youth, including Named Plaintiffs, have threatened or attempted self-harm while in solitary confinement, and others have reported experiencing profound psychological symptoms to OCFS staff.

218.  Youth in secure placement facilities will continue to endure these profound harms of solitary confinement for as long as OCFS's unlawful policies and practices continue unabated.

## CLASS ALLEGATIONS

219.  Named Plaintiffs bring this case as a class action under Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of a class of all youth who are or will be held at OCFS secure placement facilities ("Plaintiff Class").  The class also encompasses a subclass of class members with disabilities ("ADA subclass").  All class members face a substantial risk of serious harm as a result of OCFS's policies and practices.

220.  The proposed class is sufficiently numerous that joinder of all members is impracticable.  At any given time, all of the youth incarcerated in OCFS secure placement facilities are at a significant risk of unlawful solitary confinement.  As of September 2025, there were 307 youth in OCFS secure placement facilities.  Many of these youth are among the over 50% of youth in New York's juvenile justice system, including in secure placement, with a disability.  Many of these youth are unable to file lawsuits on their own behalf because of their age, disabilities, and lack of financial resources.  In addition, the class is fluid.  In 2024, 227 youth were admitted to OCFS secure facilities, while 198 were discharged.  Joinder of all class members is thus impracticable because of the size of the class and the characteristics of the class members.

221.  Common questions of law and fact affect the class members and include, without limitation:

    a.  Whether Defendants' policies and practices result in class members being locked in solitary confinement;

    b.  Whether Defendants' policies and practices deprive class members of the ability to engage in hygienic toileting, social interaction, education, and other programming;

c.  Whether the Defendants' policies and practices expose class members to a substantial risk of serious harm in violation of the Eighth and Fourteenth Amendments;

d.  Whether the Defendants acted with deliberate indifference to any such risk in violation of the Eighth and Fourteenth Amendments;

e.  Whether Defendants' policies and practices related to solitary confinement deny the ADA subclass members meaningful access to Defendants' aids, benefits, and services because of disability; and

f.  Whether the Defendants' policies and practices concerning solitary confinement have resulted in and will continue to result in a violation of the ADA subclass members' rights under the ADA.

222.  The violations of law and resulting harms presented by Named Plaintiffs' claims are typical of the violations of law and resulting harms experienced by all members of the Plaintiff Class, and ADA subclass members are similarly affected by Defendants' policies and practices in violation of the United States Constitution and the ADA.

223.  Named Plaintiffs will fairly and adequately protect the interests of all members of the class.  Their interests align closely with those of other class members, and counsel for Plaintiffs know of no conflict among class members.

224.  Two Named Plaintiffs appear by a next friend pursuant to Federal Rule of Civil Procedure 17(c), and each next friend is sufficiently familiar with the facts of the youth's situation and dedicated to the youth's best interests to fairly and adequately represent the youth's interests in this litigation.

225.  Defendants' policies and practices challenged here apply generally to the Plaintiff Class, so that declaratory and injunctive relief are appropriate respecting the entire class.

226.  Named Plaintiffs and the Plaintiff Class are represented by The Legal Aid Society and Jenner and Block LLP, counsel who are together competent and experienced in youth civil rights litigation, prisoners' rights litigation, class action litigation, and complex civil litigation.

227.  Counsel for Named Plaintiffs have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Plaintiff Class through trial and any appeals.

## CLAIMS FOR RELIEF

### First Claim for Relief
(Under 42 U.S.C. § 1983 for violation of the Eighth Amendment on behalf of all class members)

228.  Each of the foregoing allegations is incorporated as if fully set forth herein.

229.  Defendants' conduct as alleged in the complaint exposes Named Plaintiffs and putative class members to a substantial risk of serious harm.  Defendants know of that risk and are disregarding it.

230.  As a result, Defendants are violating Named Plaintiffs' and putative class members' rights under the Eighth Amendment to the United States Constitution.

### Second Claim for Relief
(Under 42 U.S.C. § 1983 for violation of the Fourteenth Amendment on behalf of all class members)

231.  Each of the foregoing allegations is incorporated as if fully set forth herein.

232.  Defendants' conduct as alleged in the complaint exposes Named Plaintiffs and putative class members to a substantial risk of serious harm.  Defendants know or reasonably should know of that risk and are disregarding it.

233.  Named Plaintiffs and putative class members have a liberty interest in remaining free from the solitary confinement Defendants impose via their policies, procedures, or practices.  Defendants' conduct as alleged in the complaint impinges on that interest without due process.

234. As a result, Defendants are violating Named Plaintiffs' and putative class members' rights under the Fourteenth Amendment to the United States Constitution.

**Third Claim for Relief**
(Under Title II of the Americans with Disabilities Act on behalf of the ADA subclass)

235. Each of the foregoing allegations is incorporated as if fully set forth herein.

236. Named Plaintiffs and putative ADA subclass members are qualified individuals with disabilities as defined by the ADA.

237. OCFS is subject to Title II of the ADA.

238. Defendants' conduct as alleged in the complaint unlawfully discriminates against Named Plaintiffs and putative ADA subclass members by reason of disability.

239. As a result, Defendants are violating Named Plaintiffs' and putative ADA subclass members' rights under Title II of the ADA.

**REQUESTS FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully request that this Honorable Court:

a.  Assert jurisdiction over this action;

b.  Certify that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

c.  Declare that Defendants' acts and omissions violate Named Plaintiffs' and class members' rights under the Eighth and Fourteenth Amendments;

d.  Declare that Defendants' acts and omissions violate Named Plaintiffs' and ADA subclass members' rights under the ADA;

e.  Enter all necessary and appropriate injunctive relief (including, but not limited to, policies, procedures, training, supervision, and monitoring) to end the ongoing violations of the United States Constitution and federal law;

f.  Award the Class the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees, pursuant to 28 U.S.C. § 1920, 42 U.S.C. § 1988, 42 U.S.C. § 12205, and Federal Rules of Civil Procedure 23(e) and (h); and

g.  Grant such other and further equitable relief as the Court deems just, necessary, and proper to protect the Plaintiff Class from further harm by Defendants.

Dated:  New York, New York
        January 5, 2026

Respectfully submitted,
THE LEGAL AID SOCIETY

By: /s/ *Lisa Freeman*

Lisa Freeman
Kathryn Wood
Emma-Lee Clinger
Antony Gemmell

40 Worth Street
New York, NY 10013
Phone: (212) 577-3300
lafreeman@legal-aid.org
kwood@legal-aid.org
eclinger@legal-aid.org
agemmell@legal-aid.org

and

JENNER AND BLOCK LLP

By: /s/ *Jeremy M. Creelan*

Jeremy M. Creelan
Damian Williams
Jacob D. Alderdice

1155 Avenue of the Americas
New York, New York 10036
Phone: (212) 891-1600

JCreelan@jenner.com
DWilliams@jenner.com
JAlderdice@jenner.com


*Attorneys for Plaintiffs*