**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Marcus F.**, **Garrett M.**, a minor, by his next friend Jared Trujillo, **Isaac R.**, a minor, by his next friend Ms. Y., and **Christopher M.**, on behalf of themselves and all other similarly situated youth,

Plaintiffs,

v.

**DaMia Harris-Madden**, in her official capacity as Commissioner of the New York State Office of Children and Family Services, and **Norman Hall**, in his official capacity as Deputy Commissioner, Division of Juvenile Justice and Opportunities for Youth,

Defendants.

1:26-CV-00148

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........ 1

FACTUAL BACKGROUND ........ 2

ARGUMENT ........ 10

I. THE PROPOSED CLASS AND SUBCLASS MEET THE REQUIREMENTS OF RULE 23(a). ........ 11

A. The Proposed Class and Subclass Are Sufficiently Numerous. ........ 11

B. There Are Questions of Law and Fact Common to the Proposed Class and Subclass. ........ 13

C. The Claims of the Named Plaintiffs Are Typical of the Claims of the Proposed Class and Subclass. ........ 16

D. The Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Proposed Class. ........ 18

E. The Proposed Class and Subclass Are Also Ascertainable. ........ 20

II. THE PROPOSED CLASS AND SUBCLASS MEET THE REQUIREMENTS OF RULE 23(b)(2). ........ 21

CONCLUSION ........ 22

# TABLE OF AUTHORITIES

**Cases**

*A.T. by and through Tillman v. Harder*,
298 F. Supp. 3d 391 (N.D.N.Y. 2018) ........ 12, 15, 18, 20

*Amchem Prods. Inc. v. Windsor*,
521 U.S. 591, 117 S.Ct. (1997) ........ 21

*Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
222 F.3d 52 (2d Cir. 2000) ........ 18, 19

*Alexander A. ex rel. Barr v. Novello*,
210 F.R.D. 27 (E.D.N.Y. 2002) ........ 19

*Barrows v. Becerra*,
24 F.4th 116 (2d Cir. 2023) ........ 13

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*,
290 F.R.D. 409 (S.D.N.Y. 2012) ........ 15, 20

*Buffington v. Progressive Advanced Ins. Co.*,
342 F.R.D. 66 (S.D.N.Y. 2022) ........ 11

*Butler v. Suffolk Cnty.*,
289 F.R.D. 80 (E.D.N.Y. 2013) ........ 13, 16

*Butto v. Collecto Inc.*,
290 F.R.D. 372 (E.D.N.Y. 2013) ........ 12

*Charron v. Pinnacle Grp. N.Y. LLC*,
269 F.R.D. 221 (S.D.N.Y. 2010) ........ 12, 19

*Clarkson v. Coughlin*,
783 F. Supp. 789 (S.D.N.Y. 1992) ........ 10, 13

*Consol. Rail Corp. v. Town of Hyde Park*,
47 F.3d 473 (2d Cir. 1995) ........ 11

*Dean v. Coughlin*,
107 F.R.D. 331 (S.D.N.Y. 1985) ........ 13

*Denney v. Deutsche Bank AG*,
443 F.3d 253 (2d Cir. 2006) ........ 18

*Elisa W. v. City of New York*,
82 F.4th 115 (2d Cir. 2023) ........ 15, 17

*G.B. et al. v. Carrion et al.*,
1:09-cv-10582 (S.D.N.Y. Dec. 19, 2013), Dkt. 431 ....................19

*Inmates of Attica Corr. Facility v. Rockefeller*,
453 F.2d 12 (2d Cir. 1971)....................14

*J.B.H. v. Knox County et al.*,
4:24-CV-04096 (C.D. Ill. Sep. 30, 2025), Dkt. 105 ....................15

*Johnson v. Kendall*,
No. 3:21-CV-1214 (CSH), 2023 WL 6227678 (D. Conn. Sept. 26, 2023) ....................19

*Johnson v. Nextel Commc'ns Inc.*,
780 F.3d 128 (2d Cir. 2015)....................14, 15

*Kaplan v. S.A.C. Cap. Advisors, L.P.*,
311 F.R.D. 373 (S.D.N.Y. 2015) ....................16

*Dajour B. ex rel. L.S. v. City of New York*,
No. 00 CIV. 2044 (JGK), 2001 WL 1173504 (S.D.N.Y. Oct. 3, 2001) ....................18

*Luyando v. Bowen*,
124 F.R.D. 52 (S.D.N.Y. 1989) ....................19

*Mangahas v. Eight Oranges Inc.*,
No. 22-CV-4150 (LJL), 2024 WL 2801922 (S.D.N.Y. May 31, 2024) ....................17

*Marisol A. v. Giuliani*,
126 F.3d 372 (2d Cir. 1997).................... *passim*

*Nicholson v. Williams*,
205 F.R.D. 92 (E.D.N.Y. 2001) ....................11

*In re Petrobras Sec.*,
862 F.3d 250 (2d Cir. 2017)....................20

*Raymond v. N.Y. State Dep't of Corr. & Cmty. Supervision*,
579 F. Supp. 3d 327 (N.D.N.Y. 2022)....................10, 20

*Robidoux v. Celani*,
987 F.2d 931 (2d Cir. 1993)....................12

*Taylor v. Zucker*,
No. 14-CV-05317 CM, 2015 WL 4560739 (S.D.N.Y. July 27, 2015)....................18

*V.W. by and through Williams v. Conway*,
236 F. Supp. 3d 554 (N.D.N.Y. 2017) .................... *passim*

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 S.Ct. 2541 (2011) ........ *passim*

*Williams v. Conway*,
312 F.R.D. 248 (N.D.N.Y. 2016) ........ 11, 15

**Constitutions**

U.S. CONST. amend. VIII ........ 14

U.S. CONST. amend. XIV ........ 14

**Statutes**

18 U.S.C. § 5043(b)(1), (b)(2)(B) ........ 3

Humane Alternatives to Long-Term Solitary Confinement Act, Ch. 93, 2021 N.Y.
Laws 93 ........ 3

N.Y. Comp. Codes R. & Regs. Tit. 9, § 168.2 ........ 4

N.Y. Comp. Codes R. & Regs. Tit. 9, § 168.4 ........ 4

**Court Rules**

Fed. R. Civ. Pro. Rule 23 ........ *passim*

Fed. R. Civ. Pro. Rule 23(a) ........ *passim*

Fed. R. Civ. Pro. Rule 23(b) ........ *passim*

## PRELIMINARY STATEMENT

This civil rights action challenges the New York State Office of Children and Family Services ("OCFS") policy and practice of solitary confinement—the involuntary isolation of youth in a locked cell or room—in its secure placement facilities. Sometimes OCFS imposes solitary confinement as punishment, often for alleged rule infractions and, at times, minor misbehavior, including manifestations of youth's disabilities. Other times, it imposes it for non-disciplinary reasons in chronically and dangerously understaffed facilities. Whatever the justification, the result is the same: near-total isolation around the clock, no education or programming, unreliable access to drinking water, and toilet restrictions so severe that youth are forced to urinate and defecate in bottles and buckets. For youth in OCFS custody—some as young as 12 and many with mental illness or other disabilities—the consequences are devastating. Prolonged isolation predictably worsens psychiatric symptoms, impairs emotional regulation, and inflicts lasting psychological harm.

Plaintiffs are four youth subjected to solitary confinement in OCFS's secure placement facilities. They bring this action on behalf of a class of youth who are or will be held at an OCFS secure placement facility and a subclass of those class members with disabilities, seeking to end OCFS's unlawful solitary confinement policies and practices in violation of the Eighth and Fourteenth Amendment and the Americans with Disabilities Act ("ADA"). Unless the court intervenes, Plaintiffs—like hundreds of similarly situated youth statewide—will continue to face the severe and lasting harms of solitary confinement. This case warrants class treatment: it challenges entrenched and systemic government policies and practices, presents legal and factual questions common to the class, and seeks class-wide injunctive relief to remedy ongoing harm. Plaintiffs satisfy

the requirements of Rule 23 of the Federal Rules of Civil Procedure, and the Court should grant this motion, certifying the proposed class and subclass.[1]

## FACTUAL BACKGROUND

### *1. Solitary Confinement Causes Significant Harm to Youth*

Solitary confinement seriously harms youth's social, psychological, and emotional development. It can cause or worsen mental health issues that, in turn, can lead to long-term and often permanent changes in an adolescent's brain development during critical periods of neurological development.[2] Compl. ¶ 78; Declaration of Louis Kraus, M.D. ("Kraus Decl.") ¶¶ 13–16. The trauma experienced in solitary confinement can alter hormonal functioning and lead to stunted brain development and advanced biological aging. Compl. ¶ 90; Kraus Decl. ¶ 15. Youth in isolation are susceptible to developing long-lasting conditions, such as psychosis, post-traumatic stress disorders, depression, anxiety, or suicidal ideation. Compl. ¶¶ 80, 82; Kraus Decl. ¶ 16. Those with preexisting mental conditions have an even greater risk of harm because isolation can intensify these conditions. Compl. ¶ 91; Kraus Decl. ¶ 17–18.

Youth with disabilities face a greater risk of long-term harm from solitary confinement. Compl. ¶ 91; Kraus Decl. ¶ 17–18. More than half of youth in New York's juvenile justice system, including in secure placement, have mental illness.[3] Compl. ¶ 17. Data additionally demonstrates that the majority of youth in the juvenile justice system have diagnosed disabilities.[4]

---

[1] Plaintiffs anticipate seeking expedited discovery to support preliminary relief from the serious harm imposed on them by OCFS. Plaintiffs reserve the right to amend this motion for class certification with additional evidence obtained during that process.

[2] Delia Fuhrman et al., Adolescence as a Sensitive Period of Brain Development, 19 TRENDS IN COGNITIVE SCIS. 558, 561–62 (2015); Laura Dimon, How Solitary Confinement Hurts the Teenage Brain, THE ATLANTIC (Jun. 30, 2014), https://www.theatlantic.com/health/archive/2014/06/how-solitary-confinement-hurts-the-teenagebrain/373002.

[3] Clara Hemphill, *Where the Sick Get Sicker: As the juvenile correctional centers empty, the mentally ill remain*, CTR. FOR N.Y.C. AFFS, https://www.centernyc.org/cww-wherethesickgetsicker.

[4] More than 50 percent of students in NYC juvenile detention and placement have documented disabilities. *Educational Programming for New York City Juvenile Delinquents, Juvenile Offenders, and Adolescent Offenders – Local*

Because the harm to youth from solitary confinement is now widely recognized, there has been a nationwide movement to eliminate its use. Compl. ¶¶ 98–103. In 2012, the United States Attorney General's National Task Force on Children Exposed to Violence concluded that "[n]owhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement," and cited increased vulnerability to suicide as an example of such impact.[5]

In 2018, Congress banned solitary confinement for youth in federal facilities. The law prohibits solitary confinement for "any reason"—including discipline—except when necessary as a "temporary response [not lasting longer than three hours] to . . . behavior that poses a serious and immediate risk of physical harm to any individual." 18 U.S.C. § 5043(b)(1), (b)(2)(B). Likewise, twenty-nine states, including New York, have passed similar laws. *See* Compl. ¶ 98. New York State itself banned the use of solitary confinement on youth in adult facilities when it enacted the Humane Alternatives to Long-Term Solitary Confinement Act in 2021.[6]

*2. OCFS's Secure Placement Facilities*

OCFS operates five secure placement facilities in New York: Brookwood Secure Center, Goshen Secure Center, MacCormick Secure Center, Industry Residential Center, and Harriet Tubman Residential Center. Brookwood has 125 beds, including 11 living units for youth. Compl. ¶ 34. Goshen has 85 beds. Compl. ¶ 35. MacCormick has 48 beds. Compl. ¶ 36. Industry has 80 beds in its secure campus, which is referred to as the Upper Campus. Compl. ¶ 37. Tubman

---

*Law 21 of 2024* (Sept. 30, 2025), https://infohub.nyced.org/docs/default-source/default-document-library/local-law-21-d79---09-29-25.pdf.

[5] *Report of the Attorney General's National Task Force on Children Exposed to Violence,* DEP'T OF JUST. at 178 (June 12, 2012), https://www.justice.gov/defendingchildhood/cev-rpt-full.pdf.

[6] Humane Alternatives to Long-Term Solitary Confinement (HALT) Act, Ch. 93, 2021 N.Y. Laws 93.

includes two living units for female youth and operates in part as a secure placement facility.[7] Compl. ¶ 38. As of September 2025, there were 307 youth in OCFS secure placement facilities. Compl. ¶ 220. The population in OCFS secure placement is constantly in flux; in 2024, 227 youth were admitted to OCFS secure facilities, while 198 were discharged.[8] Compl. ¶ 220.

*3. OCFS's Solitary Confinement Policies and Practices*

OCFS employs the routine and widespread use of solitary confinement across all of its secure placement facilities. It refers to its use of solitary confinement by many names in its regulations, policies, and practices, including room confinement, group confinement, lockdown, special programming, or modified programming. *See* 9 NYCRR §§ 168.2, 168.4; PPM 3247.15; PPM 3247.65; Declaration of Kathryn Wood ("Wood Decl.") Ex. C, D. Some of these regulations and policies explicitly prohibit the type of isolation occurring at OCFS secure placement facilities; others, have been abused by OCFS to purportedly authorize some aspects of these practices.

Regardless of OCFS's patchwork of regulations and policies, OCFS's practice of utilizing solitary confinement and imposing its dangerous conditions on youth are consistent. Youth are regularly subjected to isolation for up to 24 hours a day, at times for weeks or months. *See, e.g.*, Compl. ¶¶ 194–95. Youth locked in their cells typically do not have access to running water or toilets.[9] They cannot bathe and may be forced to urinate and defecate in makeshift containers in their room. Compl. ¶ 3. Youth in isolation are not provided with meaningful human interaction. Compl. ¶¶ 60, 62. They receive no programming and are frequently deprived of even basic reading materials. Compl. ¶ 64. Youth in solitary confinement are sometimes given limited breaks for

---

[7] Both Industry Residential Center and Harriet Tubman Residential Center operate in part as secure placement facilities and in part as limited secure placement facilities. Plaintiffs' allegations are with respect to the sections of these facilities that operate as secure placement facilities.
[8] *2024 Annual Report Youth in Care*, OFF. OF CHILD & FAM. SERVS. (2024), https://ocfs.ny.gov/reports/jj-yic/Youth-In-Care-Report-2024.pdf.
[9] Although OCFS regulations refer to "rooms," they are functionally indistinguishable from cells.

recreation in an empty gym, to shower, or attempt to call their family. Compl. ¶ 58. Despite their critical need for academic and social development, youth are deprived of educational instruction and the resources they need. Compl. ¶ 64.

OCFS's purported justifications for imposing solitary confinement include as punishment for alleged misbehavior or actions that are a manifestation of a youth's disability, Compl. ¶¶ 8, 56–57, 59; *see also* Compl. ¶¶ 123, 142, 145, 193, or as a way of operating the facilities with dangerously low staffing levels. OCFS secure placement facilities face severe staffing shortages. Compl. ¶ 60. In August 2024, overall staffing levels at each secure facility were approximately *60 to 70 percent* below capacity. Compl. ¶ 206; Wood Decl. Ex. B at 1. Staff vacancies for positions that provide critical daily care to youth are alarming. Youth Support Counselors ("YSCs") guide and mentor youth, and facilities' staffing levels of YSCs are a quarter to 50 percent below capacity. Compl. ¶ 207 n.15; Wood Decl. Ex. B at 2–3. In 2024, positions for Youth Support Specialists ("YSSs"), the staff who directly supervise youth to ensure physical and emotional safety, are currently vacant by 65 to 83 percent at secure facilities. Compl. ¶ 207 n.15; Wood Decl. Ex. B at 4. To put that in perspective, at Brookwood, where YSS positions were 81 percent vacant in August 2024, 41 staff were doing the work of 220 people. Compl. ¶ 207 n.15; Wood Decl. Ex. B at 4.

*4. Plaintiffs Have Suffered Serious Harm As a Result of OCFS's Solitary Confinement Policies and Practices*

OCFS's routine use of solitary confinement on youth in its custody and care in secure placement facilities has caused them significant harm, including serious mental deterioration. Between 2018 to 2023, self-harm episodes by youth in OCFS secure placement facilities increased

100 percent, and conduct encompassing the "expression or gesture of suicide" rose 667 percent.[10] In spring 2025, a youth attempted suicide by hanging while in solitary confinement. Compl. ¶ 84; Wood Decl. Ex. A at 2.

The Public Employees Federation ("PEF"), a union representing a portion of the staff working in OCFS secure placement facilities, has considered conditions so dire that they wrote to state legislators begging for assistance. Wood Decl. Ex. A at 2–3. In June 2025, the union stated:

> Youth [in OCFS secure placement are] reportedly confined to their rooms for up to 23 hours a day, often denied basic access to restrooms and served food in unsanitary conditions. A suicide attempt occurred under these conditions; only the quick action of a PEF member, who cut down the youth in time, prevented tragedy. The fact that these youth—predominantly Black and Brown—are forced to live in squalid, dehumanizing conditions is unconscionable.

Wood Decl. Ex. A at 2. Regarding a tour of Industry in September 2024, the union noted that "[c]ritical therapeutic programs, education, and mental health counseling were suspended due to inadequate staffing." Wood Decl. Ex. A at 1.

The Named Plaintiffs have experienced OCFS's solitary confinement practices in the same way that other youth in the facility have, and they have been similarly harmed. Between the Named Plaintiffs, they have suffered isolation at four of the secure placement facilities.

Marcus F. was placed in solitary for punitive reasons four times at Brookwood, up to weeks at a time, during which time he was alone in his cell for up to 23 hours a day. Compl. ¶¶ 112–13, 117. Since being transferred to MacCormick in July 2025, Marcus continues to be placed in solitary confinement for up to weeks on end. Compl. ¶ 121. He has been placed in solitary at MacCormick at least three times for discipline, and he has also experienced solitary for non-

---

[10] *Office of Children and Family Services: Oversight of Juvenile Justice Facilities*, OFF. N.Y. STATE COMPTROLLER, (April 2024) https://www.osc.ny.gov/files/state-agencies/audits/pdf/sga-2024-22s13.pdf.

disciplinary reasons. Compl. ¶¶ 121–24. For example, during "lockdowns," Marcus and the other youth on his unit are locked in their cells for 20 to 24 hours per day. Compl. ¶ 123.

When Marcus F. was a child, he was diagnosed with Oppositional Defiant Disorder and Attention Deficit Hyperactivity Disorder for which he received therapeutic services. Compl. ¶ 106. In 2023, when he was 15 years old, Marcus was diagnosed with a learning disability, and his school developed an Individualized Education Program ("IEP") recommending special education services. He was reading at a 6th grade reading level at that time. Compl. ¶ 106. Since being incarcerated, OCFS has provided Marcus with prescription medication to address mental health challenges. Compl. ¶ 106. He is an individual with a disability as defined by the ADA. Compl. ¶ 19.

During his time in solitary confinement, Marcus has been deprived of social interaction with peers, timely access to a bathroom, access to education and programming, access to visits and access to adequate recreation. Compl. ¶¶ 114–16, 119, 122, 124. He has also been forced to eat alone and subjected to unhygienic conditions. Compl. ¶¶ 115, 119, 122. As a result, he has deteriorated mentally and has reached such a point of despair that he is considering a transfer to an adult prison operated by the New York State Department of Corrections and Community Supervision to escape the constant threat of solitary confinement imposed by OCFS. Compl. ¶¶ 120, 126, 128.

Garrett M. has been subjected to solitary confinement for disciplinary and non-disciplinary reasons at Industry. Compl. ¶¶ 140–42. In fact, Garrett was placed in solitary for close to the entire first month of his time at Industry, due to the mere perception that he posed a behavioral risk. Compl. ¶ 141. Since then, Garrett has regularly been placed in solitary confinement as punishment. Compl. ¶ 142. Garrett has also experienced frequent unit-wide "lockdowns" resulting in

solitary confinement. Compl. ¶ 150. During these and other periods of solitary confinement, Garrett and other youth on his unit are often forced to urinate and defecate in food containers, in bottles, and on the floor when staff fail to respond to their requests for bathroom access. Compl. ¶ 150. Garrett and others have banged on their doors or yelled for assistance for hours without receiving a response. Compl. ¶ 150.

Throughout his life, Garrett experienced significant trauma, falling victim to domestic violence, sexual abuse, chronic bullying, and community violence. Compl. ¶ 136. Garrett was diagnosed with Attention Deficit Hyperactivity Disorder, Intermittent Explosive Disorder, and Oppositional Defiant Disorder. Compl. ¶ 136. He is an individual with a disability as defined by the ADA. Compl. ¶ 20. It is mandated by law that Garrett receive special education services pursuant to his IEP, under the educational classification of Emotional Disturbance. Compl. ¶ 137. At least some of the incidents resulting in Garrett's punitive isolation were the result of a manifestation of his disability. Compl. ¶ 145.

During his time in solitary confinement, Garrett has been deprived of social interaction with peers, timely access to a bathroom, access to education and programming, and access to adequate recreation. Compl. ¶¶ 144, 149–50, 152. He has also been forced to eat alone and subjected to unhygienic conditions. Compl. ¶ 152. Garrett has become anxious and depressed due to OCFS's solitary confinement practices and often acts out in order to get attention and mitigate the loneliness and isolation he suffers daily. Compl. ¶ 153.

Christopher M. has been placed in isolation for non-disciplinary reasons due to staffing shortages at Goshen. *See* Compl. ¶ 160. On multiple occasions, Christopher and his entire housing unit have been subjected to solitary confinement for non-disciplinary reasons. Additionally, like

all the other youth at Goshen, he is placed in solitary confinement almost every weekend due to OCFS's inability to manage the youth in its care. Compl. ¶ 161.

During his time in solitary confinement, Christopher has been deprived of social interaction with peers, timely access to a bathroom, access to education and programming, access to visits, and access to adequate recreation. Compl. ¶¶ 161–62. He has also been forced to eat alone and subjected to unhygienic conditions. Compl. ¶ 161. Christopher's mental health has significantly deteriorated as a result of OCFS's imposition of solitary confinement. Compl. ¶ 169. He has been placed on suicide watch after expressing a desire to kill himself due to the extensive time he spent in solitary confinement. Compl. ¶ 169. He is an individual with a disability as defined by the ADA. Compl. ¶ 21. Nearly every day, Christopher feels compelled to trigger a disturbance solely to get the attention of higher-level staff so he can escape the hopelessness of solitary for a brief period of time. Compl. ¶ 170. Christopher M. is also considering a transfer to an adult prison to escape OCFS's inhumane treatment. Compl. ¶ 174.

Isaac R. has been placed in solitary confinement as punishment for seven consecutive days at Goshen. Compl. ¶ 193. He has also been placed in solitary for non-disciplinary reasons due to staffing shortages there. For example, in February and March 2025, Isaac and all the other youth in his unit were locked in solitary confinement for about a month and kept in their cells for up to 24 hours a day. Compl. ¶¶ 194–95.

During his time in solitary confinement, Isaac has been deprived of social interaction with peers, timely access to a bathroom, access to education and programming, access to visits and telephone calls, and access to adequate recreation. Compl. ¶ 193, 195. Isaac suffers from post-traumatic stress disorder and is an individual with a disability as defined by the ADA. Compl.

¶¶ 22, 183. Isaac's mental health has suffered, exacerbating his preexisting post-traumatic stress response. Compl. ¶ 197.

## ARGUMENT

Plaintiffs filed this suit to end OCFS's unlawful policy and practice of imposing solitary confinement on youth. Plaintiffs seek to certify a class of youth who are or will be held at an OCFS secure placement facility and a subclass of those class members with disabilities ("ADA subclass").

The Court should certify this class and subclass because they meet the requirements of Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. Rule 23(a) contains four explicit prerequisites to class certification: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. Fed. R. Civ. P. 23(a). In addition, some courts have also recognized an implicit requirement of ascertainability. *See Raymond v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 579 F. Supp. 3d 327, 340 (N.D.N.Y. 2022). Rule 23(b)(2) requires that the defendant have "acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b).

As the Second Circuit has explained, district courts must give Rule 23 a "liberal rather than restrictive construction" and "adopt a standard of flexibility." *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir. 1997) (citation modified). And challenges to conditions of confinement are "particularly well-suited" to class treatment because incarcerated plaintiffs "come and go from institution for a variety of reasons . . . [yet] the underlying claims tend to remain." *Clarkson v. Coughlin*, 783 F. Supp. 789, 797 (S.D.N.Y. 1992). Class certification thus "tend[s] to be the norm"

in such cases. *Williams v. Conway*, 312 F.R.D. 248, 251–52 (N.D.N.Y. 2016) (quoting *Clarkson*, 783 F. Supp. at 797).

## I. THE PROPOSED CLASS AND SUBCLASS MEET THE REQUIREMENTS OF RULE 23(a).

### A. The Proposed Class and Subclass Are Sufficiently Numerous.

The proposed class and subclass each meet the requirement that their members be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A class of 40 members is presumptively numerous. *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). And "the Second Circuit has relaxed the numerosity requirement where," as here, "the putative class seeks injunctive and declaratory relief pursuant to Rule 23(b)(2)." *Nicholson v. Williams*, 205 F.R.D. 92, 98 (E.D.N.Y. 2001) (citing *Robidoux v. Celani*, 987 F.2d 931, 935–36 (2d Cir. 1993)).

The "reasonable inferences drawn from the available facts" demonstrate that the proposed class and subclass are in the hundreds and joinder is impracticable. *See Buffington v. Progressive Advanced Ins. Co.*, 342 F.R.D. 66, 70 (S.D.N.Y. 2022) (citation omitted); *see also V.W. by and through Williams v. Conway*, 236 F. Supp. 3d 554, 574 (N.D.N.Y. 2017) (finding numerosity "clearly" satisfied when at least 86 different juveniles had been placed in solitary confinement in the previous year). Recent data show that the proposed class has hundreds of members. *See* OCFS, *2024 Annual Report: Youth in Care*, tbl. 4 (2024) (reflecting 282 youth held in OCFS secure placement facilities as of the end of 2024).[11] And of those members, the court can reasonably assume that more than 40 are part of the disability subclass. For example, over 50 percent of youth in New York's juvenile justice system, including in secure placement, are estimated to have a mental

[11] Available at, ocfs.ny.gov/reports/jj-yic/Youth-In-Care-Report-2024.pdf.

health disorder, placing most if not all in the disability subclass.[12] *See Butto v. Collecto Inc.*, 290 F.R.D. 372, 381 (E.D.N.Y. 2013) ("[C]ourts are empowered to make common sense assumptions to support a finding of numerosity." (citation modified)).

The proposed class encompasses all youth at secure placement facilities because all youth face a reasonably foreseeable risk of being subjected to OCFS's pervasive use of solitary confinement. *See A.T. by and through Tillman v. Harder*, 298 F. Supp. 3d 391, 406–07 (N.D.N.Y. 2018) (finding numerosity for a proposed class of all juveniles who have been or who will be held in solitary confinement at a facility because "courts routinely certify classes that encompass . . . members who have actually been subjected to a challenged policy or practice" and "similarly situated individuals at reasonably foreseeable risk of facing the same fate"); *see also Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 226–27, 229 (S.D.N.Y. 2010) (certifying class of plaintiffs who "either have been subjected to, or are at risk of being subjected to, the same general course of [unlawful] conduct").

Beyond mere numbers, several contextual factors weigh in favor of numerosity. First, litigating this suit as a class promotes judicial economy, preventing duplicative individual suits that would raise the same issues and seek identical relief. *See, e.g.*, *A.T.*, 298 F. Supp. 3d at 407; *V.W.*, 236 F. Supp. 3d at 574. Second, the five OCFS secure facilities are geographically dispersed across New York State making joinder impracticable. *See* Compl. ¶¶ 34–38; *Robidoux*, 987 F.2d at 936. Third, class members, the majority of whom are minors, generally lack the ability to hire individual counsel and file individual suits because of their age, disabilities, and lack of financial resources. Compl. ¶ 220.

---

[12] Hemphill, *Where the Sick Get Sicker*; *see also Youth Involved in the Juvenile Justice System*, YOUTH.GOV, https://youth.gov/youth-topics/juvenile-justice/youth-involved-juvenile-justice-system#_ftn19.

Finally, the proposed class and subclass are "the sort of revolving population that makes joinder of individual members a difficult proposition." *V.W.*, 236 F. Supp. 3d at 574; *Dean v. Coughlin*, 107 F.R.D. 331, 332–33 (S.D.N.Y. 1985) ("The fluid composition of a prison population is particularly well-suited for class status, because, although the identity of the individuals involved may change, the nature of the wrong and the basic parameters of the group affected remain constant."). Here, 227 youth were admitted to OCFS secure placement as of the end of 2024, with 198 youth having been discharged from secure placement facilities during that same year. OCFS, *2024 Annual Report: Youth in Care*, tbls. 2, 7 (2024). In addition, because the proposed class seeks injunctive relief that would involve future class members, it is best addressed as a class action. *See Butler v. Suffolk Cnty.*, 289 F.R.D. 80, 98 (E.D.N.Y. 2013) (noting that in the context of injunctive classes in prison litigation, "it is not only proper, but preferred, to include future detainees"); *cf. Clarkson*, 145 F.R.D. at 348 (certifying class of current and future incarcerated individuals with hearing impairments where seven class members had been identified because of "inherently 'fluid'" nature of the class).

### B. There Are Questions of Law and Fact Common to the Proposed Class and Subclass.

The questions of law and fact raised here are "common to the class," Fed. R. Civ. P. 23(a)(2), because their "resolution will affect all or a significant number of the putative class members," *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2023) (citation omitted). To satisfy the commonality requirement, class claims "must depend upon a common contention" that is "capable of classwide resolution." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350, 131 S.Ct. 2541, 2551 (2011). Here, Plaintiffs seek a class-wide injunction ending the use of solitary confinement in OCFS secure placement facilities, which would benefit all members of the class and subclass.

Plaintiffs challenge a solitary confinement practice that places all class members at risk. *See Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) ("Where the same conduct or practice gives rise to the same kind of claims from all class members, there is a common question." (citation modified)). That challenge raises factual and legal questions, the "common answers" to which are "apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350, 131 S.Ct. at 2551. For the class, these common questions include:

- Whether Defendants' policies and practices result in class members being locked in solitary confinement;
- Whether Defendants' policies and practices deprive class members of the ability to engage in hygienic toileting, social interaction, education, and other programming;
- Whether Defendants' policies and practices expose class members to a substantial risk of serious harm in violation of the Eighth and Fourteenth Amendments; and
- Whether Defendants acted with deliberate indifference to any such risk in violation of the Eighth and Fourteenth Amendments.

For the ADA subclass, the common questions include:

- Whether Defendants' policies and practices related to solitary confinement deny the ADA subclass members meaningful access to Defendants' aids, benefits, and services because of disability; and
- Whether Defendants' policies and practices concerning solitary confinement have resulted in and will continue to result in a violation of the ADA subclass members' rights under the ADA.

Any of these questions suffices to satisfy Rule 23(a)'s commonality requirement. *See Wal-Mart*, 564 U.S. at 359, 131 S.Ct. at 2556 ("[E]ven a single common question will do." (citation modified)). And in the context of carceral litigation specifically, courts frequently find commonality where incarcerated individuals share "a common interest in preventing the recurrence of [] objectionable conduct." *Inmates of Attica Corr. Facility v. Rockefeller*, 453 F.2d 12, 24 (2d Cir.

1971); *see also, e.g.*, *V.W.*, 236 F. Supp. 3d at 575–76 (finding commonality where incarcerated plaintiffs challenged jail's isolation of youth and denial of educational access).

"[C]laims for relief need not be identical for them to be common." *Johnson*, 780 F.3d at 137. And "factual differences in the claims of the class do not preclude a finding of commonality." *V.W.*, 236 F. Supp. 3d at 575 (quoting *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 287 (S.D.N.Y. 2012)). What "matters to class certification is not the raising of common questions . . . but rather the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350, 131 S.Ct. at 2551 (citation modified). If "the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Johnson*, 780 F.3d at 137 (citation omitted).

Here, though minor variations may exist in the claims and factual circumstances of individual youth, the challenge against OCFS's solitary confinement policies and practices is fundamentally the same across the class, raising common questions whose answers can be resolved on a class-wide basis. *See, e.g.*, *Elisa W. v. City of New York*, 82 F.4th 115, 124 (2d Cir. 2023) (finding commonality despite factual variations where agency had common practice of departing from its stated policy); Order at 10, *J.B.H. v. Knox County et al.*, 4:24-CV-04096 (C.D. Ill. Sep. 30, 2025), Dkt. 105 (Ex. 1) (finding class of juveniles alleging isolation satisfied commonality by asserting "several common issues"); *A.T.*, 298 F. Supp. 3d at 408 (finding commonality where subclasses challenge constitutionality of a "common course of conduct"); *Williams*, 312 F.R.D. at 253 (certifying class of deaf and hard-of-hearing plaintiffs who alleged jail failed to provide them varying disability accommodations); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 418 (S.D.N.Y. 2012) (certifying class with "diverse disabilities" despite finding that members "will not all be affected by the alleged omissions in the City's plan in the same way.").

The critical questions are clearly common. For example, the question of whether youth in secure placement facilities are subjected to a substantial risk of serious harm is common. OCFS uses solitary as punishment across all five secure placement facilities. Compl. ¶ 2; *see also* Compl. ¶¶ 19–22. Additionally, each facility suffers from severe staffing shortages, and thus relies on the systemic use of solitary confinement to manage these shortages. Compl. ¶¶ 59–61. The declaration of Dr. Kraus also attests to the substantial risk of serious harm that these practices pose to the proposed class. Kraus Decl. ¶¶ 9–31.

Additionally, whether Defendants were deliberately indifferent to the risks posed by their solitary confinement practices is common. *See, e.g.*, *Butler*, 289 F.R.D. at 98 ("Whether the County was aware of and deliberately indifferent to the conditions at [the jails] is a common question subject to class-wide resolution."). OCFS officials either were on notice of these risks, or they recklessly disregarded them. Self-harm episodes in secure placement rose 100 percent between 2018 and 2023, and in spring 2025, a youth attempted suicide while in isolation. Compl. ¶¶ 83–84. Across all secure placement facilities, youth, their families, legislators, and even leadership of the PEF have complained about the harms posed by OCFS's use of solitary confinement. Compl. ¶¶ 200, 203, 208, 210.

While only one common question is needed to establish commonality under Rule 23(a), *Wal-Mart*, 564 U.S. at 359, 131 S.Ct. at 2556, both separately and together, the above questions easily meet the requirements.

### C. The Claims of the Named Plaintiffs Are Typical of the Claims of the Proposed Class and Subclass.

The typicality prong of Rule 23(a) "requires that the claims of the class representatives be typical of those of the class." *Marisol A.*, 126 F.3d at 376. This test is "not demanding." *Kaplan v. S.A.C. Cap. Advisors, L.P.*, 311 F.R.D. 373, 379 (S.D.N.Y. 2015) (quoting *Tsereteli v.*

*Residential Asset Securitization Tr. 2006–A8*, 283 F.R.D. 199, 208 (S.D.N.Y. 2012)). The element is satisfied so long as plaintiffs allege "the same unlawful conduct" affected the named plaintiffs and the class. *Mangahas v. Eight Oranges Inc.*, No. 22-CV-4150 (LJL), 2024 WL 2801922, at *9 (S.D.N.Y. May 31, 2024) (quoting *Robidoux*, 987 F.2d at 936–37). "The commonality and typicality requirements tend to merge into one another" and are commonly analyzed together, thus a finding of commonality lends itself to a finding of typicality. *See Marisol A.*, 126 F.3d at 376; *see also Elisa W.*, 82 F.4th at 128.

Typicality is met here because Plaintiffs all suffer from the same unconstitutional solitary confinement practices as the class. OCFS has policies and practices that it applies to all youth. The implementation—and abuse—of those policies and practices is what results in solitary confinement of youth across all secure placement facilities. All youth at each of OCFS's secure facilities are subject to the same unreasonable risk.

Marcus, Garrett, Isaac, and Christopher have suffered and continue to suffer the threat of the same conditions as the other youth held at OCFS secure placement facilities. Their experiences are consistent with each other and span multiple OCFS secure placement facilities. Nor do their experiences differ materially from other youth because OCFS employs the same policies and practices across all its secure placement facilities. Plaintiffs have experienced solitary confinement as punishment and for non-disciplinary reasons. *See* Compl. ¶¶ 111–12, 117, 121, 123, 141–42, 160–61, 192–94. Each has suffered harms, including deprivation of social interaction with peers, timely access to a bathroom, access to education and programming, and access to adequate recreation. Compl. ¶¶ 114, 119, 122, 150, 152, 161–65, 193, 195. They have also been forced to eat alone and subjected to unhygienic conditions. Compl. ¶¶ 115, 119, 122, 150–52, 162. As a result, each has experienced a deterioration in his mental health. *See* Compl. ¶¶ 126, 153, 169, 197.

Additionally, each has a disability. Compl. ¶¶ 19–22. Plaintiffs fully satisfy the typicality requirement of Rule 23(a)(3).

### D. The Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Proposed Class and Subclass.

Federal Rule of Civil Procedure 23(a)(4) requires that "the representative parties . . . fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy of representation entails an "inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

As to the first inquiry, "Plaintiffs must . . . demonstrate that 'there is no conflict of interest between the named plaintiffs and other members of the plaintiff class.'" *Taylor v. Zucker*, No. 14-CV-05317 CM, 2015 WL 4560739, at *8 (S.D.N.Y. July 27, 2015) (quoting *Marisol A.*, 126 F.3d at 378). "A conflict or potential conflict alone will not, however, necessarily defeat class certification—the conflict must be 'fundamental.'" *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) (citation omitted). Here, there is no such conflict. Plaintiffs have been and continue to be subjected to solitary confinement and are seeking injunctive relief that would require OCFS to end its policy and practice of unlawfully placing youth in its custody in solitary confinement. The relief Plaintiffs are seeking would benefit all youth at secure placement facilities. Therefore, the interests of class members are identical to those of the Plaintiffs. *See Marisol A.*, 126 F.3d at 378 (concluding that the "interests of the class members" were identical to the plaintiffs' because plaintiffs sought "broad based relief that would require [defendant] to dramatically improve the quality of all its services"); *A.T.*, 298 F. Supp. 3d at 410; *Dajour B. ex rel. L.S. v. City of New York*, No. 00 CIV. 2044 (JGK), 2001 WL 1173504, at *9 (S.D.N.Y. Oct. 3, 2001).

As to the second inquiry, Plaintiffs' counsel, The Legal Aid Society and Jenner & Block are "qualified, experienced and able to conduct the litigation." *Baffa*, 222 F.3d at 60. Both The Legal Aid Society and Jenner & Block have extensive experience in class action litigation and have represented classes of plaintiffs seeking systemic reform in federal court class action lawsuits. *See, e.g.*, *Charron*, 269 F.R.D. at 234 (concluding that Jenner & Block was "qualified, experienced and more than able to conduct this litigation, no matter how complicated it becomes"); *Johnson v. Kendall*, No. 3:21-CV-1214 (CSH), 2023 WL 6227678, at *7 (D. Conn. Sept. 26, 2023) (concluding that Jenner & Block had "significant experience litigating class actions" and therefore constituted fair and adequate counsel); Order for Class Certification and for Approval of the Settlement on Behalf of the Class, *G.B. et al. v. Carrion et al.*, 1:09-cv-10582 (S.D.N.Y. Dec. 19, 2013), Dkt. 431 (Ex. 2) (certifying class of youth represented by The Legal Aid Society in several OCFS limited secure facilities challenging use of restraints and provision mental health services and entering injunctive and damages settlement); *Alexander A. ex rel. Barr v. Novello*, 210 F.R.D. 27, 34 (E.D.N.Y. 2002) ("As far as the class counsel is concerned, plaintiffs are represented by the Legal Aid Society of the City of New York, which, plaintiffs maintain, 'enjoys a wide reputation for the devotion of its staff and the quality of its service.'" (citation omitted)); *Luyando v. Bowen*, 124 F.R.D. 52, 55–56, 56 n.3 (S.D.N.Y. 1989) (noting that The Legal Aid Society "has litigated numerous class actions and has sufficient resources and experience to protect the interests of the class members" and has an "excellent reputation"). Accordingly, Plaintiffs' will fairly and adequately protect the interests of the proposed class.

### E. The Proposed Class and Subclass Are Also Ascertainable.

To the extent Rule 23's implied requirement of ascertainability applies here,[13] the proposed class and subclass satisfy that "modest threshold." *In re Petrobras Sec.*, 862 F.3d 250, 269 (2d Cir. 2017). Ascertainability "requires only that a class be defined using objective criteria that establish a membership with definite boundaries" and "will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *Id.*; *see also Raymond*, 579 F.Supp.3d at 340 ("[A] Rule 23(b)(2) class is ascertainable as long as its 'general demarcations' are clear (quoting *Floyd v. City of New York*, 283 F.R.D. 153, 162 (S.D.N.Y. 2012)).

Here, membership in the class and subclass are defined by clear, objective criteria: for the class, whether an individual is or will be held at an OCFS secure placement facility; and for the subclass, whether a class member also has a disability. Both criteria are readily subject to determination, including using OCFS's own records. *See, e.g.*, *A.T.*, 298 F. Supp. 3d at 411 (concluding class of incarcerated youth and subclass with disabilities sufficiently ascertainable in part because membership could be determined using defendant jail's own records); *V.W.*, 236 F. Supp. 3d at 577 (similar). And courts routinely conclude classes and subclasses defined by incarceration at specific facilities, by disability, or sometimes by both, satisfy the implied ascertainability requirement. *See, e.g.*, *A.T.*, 298 F. Supp. 3d at 411; *V.W.*, 236 F. Supp. 3d at 577.

---

[13] Courts have frequently called into question whether the ascertainability requirement applies to Rule 23(b)(2) classes. *See, e.g.*, *Brooklyn Ctr. for Indep. of the Disabled*, 290 F.R.D. at 419 n.3 ("It is not clear that the ascertainability requirement applies to Rule 23(b)(2) class actions . . . as notice is not obligatory and the relief sought is injunctive rather than compensatory."); *see also Raymond*, 579 F. Supp. 3d 327 at 340 (calling the requirement "muted" on the same grounds).

## II. THE PROPOSED CLASS AND SUBCLASS MEET THE REQUIREMENTS OF RULE 23(b)(2).

The class and subclass meet the requirements of Rule 23(b)(2) because Plaintiffs allege that OCFS "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) is amply satisfied here because class-wide relief is appropriate.

Class certification under Rule 23(b) is proper where allegations "stem from central and systemic failures." *Marisol A.*, 126 F.3d at 378. The Supreme Court has identified civil rights cases as "prime examples" of Rule 23(b)(2) class actions. *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. at 2231 (1997). The conduct here "is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them," and "a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart*, 564 U.S. at 360, 131 S.Ct. at 2557 (citation omitted).

Here, every class member, regardless of the facility in which they are placed, is subject to OCFS's system-wide policies and practices regarding solitary confinement, and thus at risk of having their constitutional and statutory rights violated by those unlawful practices. Plaintiffs' requested injunctive relief would provide a remedy benefiting the class as a whole by protecting youth from unconstitutional and unlawful solitary confinement. *See V.W.*, 236 F. Supp. 3d at 577 (granting class certification and finding that members of a class of youth challenging solitary confinement "would benefit from the same remedy—an order enjoining defendants from application of the policies and practices resulting in the deprivations at issue").

## CONCLUSION

As Plaintiffs satisfy the requirements of Rule 23(a) and (b)(2), Plaintiffs respectfully request that the Court grant their Motion for Class Certification.

Dated: January 8, 2026

Respectfully submitted,

/s/ *Lisa Freeman*

THE LEGAL AID SOCIETY

Lisa Freeman
Kathryn Wood
Emma-Lee Clinger
Antony Gemmell

40 Worth Street
New York, NY 10013
Phone: (212) 577-3300
lafreeman@legal-aid.org
kwood@legal-aid.org
eclinger@legal-aid.org
agemmell@legal-aid.org

/s/ *Jeremy M. Creelan*

JENNER & BLOCK LLP

Jeremy M. Creelan
Damian Williams
Jacob D. Alderdice

1155 Avenue of the Americas
New York, New York 10036
212-891-1600
JCreelan@jenner.com
DWilliams@jenner.com
JAlderdice@jenner.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this memorandum of law is in compliance with the word limit set forth in the Joint Local Rules, S.D.N.Y. and E.D.N.Y. According to the word processing program used to prepare this memorandum, the total number of words in the mWilemorandum, excluding the caption, table of contents, table of authorities, and signature block, is 6,643.

Dated: January 8, 2026